Regina BROWN, Administratrix and Administratrix Ad Prosequendum of the Estate of Debbie Evans

v.

Detective Felix GRABOWSKI, individually and as a police officer of the Roselle Police Department, New Jersey; Patrolman William Schwartz, individually and as a police officer of the Roselle Police Department, New Jersey; Chief Vincent F. Trolan, individually and as Chief of the Roselle Police Department, New Jersey; Roselle Police Department; and The Borough of Roselle.

Appeal of Felix GRABOWSKI, William Schwartz, Vincent F. Trolan, and the Borough of Roselle, Appellants in 89–5487.

Appeal of Regina BROWN, Appellant in 89–5532.

Nos. 89–5487, 89–5532.

United States Court of Appeals, Third Circuit.

Argued Jan. 16, 1990.

Decided Dec. 31, 1990.

Rehearing and Rehearing In Banc Denied Jan. 29, 1991.

Barry T. Albin (argued), James E. Trabilsy, Richard P. Jacobson, Wilentz, Goldman & Spitzer, Woodbridge, N.J., for appellant in 89–5532.

Lindsey H. Taylor (argued), Kalb, Friedman, Siegelbaum & Moran, Roseland, N.J., Irving F. Sturm, Mun. Atty., Roselle, N.J., for appellants in 89–5487.

Before BECKER, GREENBERG and NYGAARD, Circuit Judges.

### OPINION OF THE COURT

BECKER, Circuit Judge.

Deborah Evans was found frozen to death in the trunk of her car in February of 1985 in a motel parking lot in Iselin, New Jersey. Clifton McKenzie, Evans' former live-in boyfriend, had abducted her and imprisoned her there. In a separate epi-

sode, which occurred shortly before this fatal abduction, McKenzie had held Evans hostage for a period of three days, during which he repeatedly threatened and sexually assaulted her. During the weekend following this preliminary reign of terror, members of Evans' family and Evans herself related these events to Patrolman William Schwartz and Detective Felix Grabowski of the Police Department of Roselle Borough, where Evans lived and where most of the events took place. Despite the entreaties of Evans and her family, however, no criminal charges against McKenzie were filed.

These cross-appeals are from the district court's summary judgment rulings in a civil rights case that Evans' personal representative brought against the Borough and employees of its police department. This action is based upon allegations that, but for the sloth and callousness of the department in general and of Detective Grabowski in particular, Evans' death would not have occurred. Plaintiff asserts that the defendants, discriminatorily and through willful neglect, denied Evans her constitutional rights to due process and of access to the civil and criminal courts. Plaintiff further alleges that the Roselle Police Department had a long-standing policy of inaction in domestic violence cases, motivated by discrimination against women, leading to a violation of Evans' equal protection rights.

Because of the absence of finality, we lack appellate jurisdiction over several of the district court's orders granting or denying summary judgment with respect to plaintiff's federal claims. Deciding a question of first impression in this circuit, and influenced by New Jersey's inhospitability to interlocutory appeals, we conclude that the doctrine of *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), does not provide us with jurisdiction to entertain the appeals by the defendant police officers from the denial of their motions for summary judgment, on grounds of qualified immunity, with respect to plaintiff's *state* law claims. Under *Mitchell*, however, we plainly have appellate jurisdiction over the appeals of Detective Gra-

bowski, Officer Schwartz, and Roselle Police Chief Vincent Trolan (in his individual capacity) from the district court's denials of their motions for summary judgment invoking qualified immunity as a defense to several of plaintiff's *federal* claims.

Our qualified immunity inquiry presents a novel question concerning the scope of review of the district court's decisions denying defendants' claims of qualified immunity. We conclude that, in determining whether the district court properly denied defendants' claims of immunity, we may consider not only whether the rights that defendants are claimed to have violated were clearly established at the time of their contact with Evans, but also whether they were established at all. In addition, we construe *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), and our own precedents to require that we engage in an analysis of the facts adduced concerning defendants' conduct—and not only the pleadings—in determining whether they are entitled to qualified official immunity.

On the merits, plaintiff's claim of denial of access to the civil courts presents us with some difficulty. In framing this cause of action, plaintiff relies on a New Jersey statute that expands avenues of recourse for victims of domestic violence, requiring that police inform these victims of their right to obtain a restraining order against an attacker in the civil courts. In light of this statute and the egregious inaction of Detective Grabowski, plaintiff presents an appealing case for relief. Ultimately, however, plaintiff's theory that defendants violated Evans' right of access to the civil courts by failing to provide her with the assistance required by New Jersey law is not constitutionally cognizable. The constitutional right of access to the civil courts simply is not expansive enough to encompass the state statutory rights that defendants are claimed to have violated. Plaintiff's theory also runs afoul of the Supreme Court's holding in *DeShaney v. Winnebago County Department of Social Service*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), that a state's failure to take affirmative action to protect a victim

from the actions of a third person will not, in the absence of a custodial relationship between the state and the victim, support a civil rights claim. *DeShaney* compels the additional conclusion that plaintiff's civil court access claim does not present a genuine issue of material fact. Consequently, from both a legal and a factual perspective, a reasonable police officer could not have known that by failing to facilitate Evans' access to the civil courts, he was in any way violating her constitutional rights. Accordingly, we must reverse the district court's denial of defendants' motion for summary judgment on plaintiff's civil court access claim.

The propriety of the district court's refusal to grant summary judgment for defendants on plaintiff's equal protection claim turns on the degree to which the principles set forth in *Hynson v. City of Chester*, 864 F.2d 1026 (3d Cir.1988), were clearly established at the time of the events in question. *Hynson* holds that the equal protection clause is implicated when (1) the policy or custom of the police is to provide less protection to victims of domestic violence than to other victims of violence; (2) discrimination against women is a motivating factor; and (3) the plaintiff has been injured by this custom. Although plaintiff might survive defendants' motion for summary judgment had the events in question occurred after *Hynson*, we read that case as announcing a new principle of law in this circuit. We conclude that the right to equal protection that plaintiff asserts was not clearly established in 1985. Because a reasonable police officer would not have known that he was violating Evans' right to equal protection, Grabowski's and Schwartz's motions for summary judgment based on qualified immunity should have been granted. Further, because there is no evidence of his personal involvement in the actions or matters in question, we must also reverse the district court's denial of summary judgment for Chief Trolan, sued in his individual capacity.

## I. FACTS AND PROCEDURAL HISTORY

The facts of this case, which are essentially uncontested, chronicle with numbing detail the disturbing inaction on the part of Roselle's Police Department that led to this tragedy.

Deborah Evans' ordeal began early in January of 1985, when Clifton McKenzie, without permission, left the drug rehabilitation center into which he had been paroled following a conviction on forgery and drug charges. According to McKenzie, he began using heroin and related drugs within four days of leaving his treatment program. Immediately after leaving the center, McKenzie, who previously had lived with Evans, took up residence in her apartment. Evans objected to McKenzie's presence there and told him that she wanted nothing else to do with him, unless he returned to his rehabilitation program.

Several days after McKenzie took up residence with her, Evans left her apartment and asked a friend, Jan Parker, to retrieve her apartment keys from McKenzie. When Parker arrived at Evans' apartment, McKenzie beat her until she lost consciousness. McKenzie then abducted Parker and drove her to New York City in her car. Once in New York, Parker managed to escape, contacted the New York City Housing Authority Police, and was taken to a hospital.

The Housing Authority Police immediately reported the incident to the Roselle Police Department, where the investigation of the assault and kidnapping of Jan Parker fell to Detective Felix Grabowski, now a defendant in this case. Based on his conversations with a Housing Authority patrolman, the doctor who treated Parker, and Parker herself, Grabowski determined that there was probable cause to believe that McKenzie had committed aggravated assault, kidnapping, and car theft. Grabowski did not seek to obtain a warrant for McKenzie's arrest, however, and merely advised Parker to come to Roselle Police Headquarters upon her release from the hospital to give a formal statement that would support the issuance of a criminal complaint.

On the same day that he assaulted and abducted Jan Parker, McKenzie returned to

Roselle for Deborah Evans, who would receive even less help than did Parker from the local police. McKenzie asked Evans to drive him back to the drug rehabilitation center, but instead abducted her. After forcing Evans to let him drive, McKenzie made her get out of the vehicle in the middle of the Pulaski Skyway, assaulted her, and then threatened to throw her from the top of the Skyway bridge. That night, McKenzie drove Evans back to her apartment. Except for taking Evans on an excursion to withdraw money from her bank account for a drug purchase, McKenzie held her there against her will for the next three days, constantly monitoring her actions and refusing even to permit her to answer her telephone. During this time, McKenzie sexually assaulted Evans twice. In addition to slapping Evans a number of times, McKenzie also threatened her with a butcher knife, indicated that he soon would kill her, forced his fingers into her mouth, and, placing his hands over her mouth, pinned her to her couch. Evans' three-day ordeal came to an end only when, against McKenzie's instructions, she opened her apartment door to her brother and sister and McKenzie fled through the bathroom window of her apartment, taking her purse with him.

Evans' brother and sister, who had contacted the Roselle Police Department a total of five times during the three days of Evans' disappearance, accompanied her to the Roselle Police Station. There, Evans briefly recounted her story to defendant Patrolman William Schwartz. Schwartz made a preliminary report and referred the matter to Grabowski, who, with a second detective, interviewed Evans. The two detectives then met with the Borough's assistant prosecutor, William Daniel, who instructed Grabowski to elicit a formal statement from Evans to support the filing of a criminal complaint against McKenzie.[1]

In the course of providing her formal statement, Evans, in addition to relating what had befallen her during the previous three days, informed Grabowski that she had, in the past, lived intimately with McKenzie. Grabowski concluded that this prior relationship between the two undermined Evans' assertion that McKenzie had kidnapped and sexually assaulted her. In response to questioning from the detectives in the immediate aftermath of her trauma, Evans also stated that she believed she could have escaped from McKenzie on several occasions, but that she had remained with him because she wanted her keys back. Although he believed that McKenzie had held Evans for three days, often at knife point, Grabowski evidently concluded that Evans' responses further undermined possible kidnapping and sexual assault charges against McKenzie. Because Evans reported that she had showered before arriving at the police station, Grabowski also concluded that it would be difficult to establish sexual assault charges.

Unable to reach Assistant Prosecutor Daniel for advice on whether to lodge kidnapping and sexual assault charges against McKenzie, Grabowski told Evans to return to the police station on the Monday two days hence to file charges, the nature of which he did not specify. There is conflicting testimony as to whether Grabowski ever intended to lodge these charges. It is clear, however, that he did not inform Evans of her rights under New Jersey's Prevention of Domestic Violence Act, in particular, her right, as a victim of domestic violence, to obtain a restraining order against McKenzie from the Juvenile and Domestic Relations court, even on a weekend.[2]

---

1. Under New Jersey law at the time, police were required to obtain the approval of a county prosecutor prior to filing a charge for an indictable offense. It was not necessary, however, for either the police or a victim to obtain such approval prior to filing a nonindictable disorderly persons complaint.

2. The Domestic Violence Act provides:

A law enforcement officer shall disseminate to the victim the following notice, which shall be written in both English and Spanish:
"You have the right to go to the Juvenile and Domestic Relations Court and file a complaint requesting relief including, but not limited to the following: an order restraining your attacker from abusing you or directing your attacker to leave your household. You may request that the clerk of the court assist

After Evans had left the police station, Grabowski succeeded in reaching Assistant Prosecutor Daniel. Grabowski told Daniel that kidnapping and sexual assault charges against McKenzie would be difficult to prove. Grabowski did not, however, actually read Evans' statement to Daniel. Based upon Grabowski's characterization of the case, Daniel agreed that there was no probable cause to charge McKenzie. Daniel later concluded that, had Grabowski read Evans' entire statement to him, he would have authorized the filing of the kidnapping and sexual assault charges.

Grabowski testified that the Roselle police made an effort to find McKenzie during the weekend, but conceded that they made no attempts to arrest him. Although Grabowski further testified that protection would have been forthcoming had Evans requested it, he also testified that no patrol units were assigned to protect her.

On the Monday following the weekend, Evans left her mother's house, where she had stayed for the weekend, to renew her efforts to file a complaint against McKenzie. She did not reach the police station, however, and was never again seen alive. McKenzie once more abducted Evans and ultimately placed her, unconscious, in the trunk of her car, where she froze to death. Evans' body was discovered nearly a month later, still in the trunk of her car, which was parked outside of a motel where McKenzie had overdosed on drugs. McKenzie, whose testimony revealed remorse and suggested that he may have experienced drug-induced rages and "blackout" periods during the time he terrorized Evans and Parker, subsequently was convicted of kidnapping and first degree murder.

This incident constituted one of the factors that prompted an investigation of the Roselle Police Department's Detective Bureau by the Union County Prosecutor's Office. Vincent Trolan, the Roselle Police Chief, resigned within a year of the mis-handling of Evans' case. The prosecutor's investigation report stated that the Roselle Police Department's Detective Bureau was "completely unsupervised." In response to this investigation, Chief Trolan had prepared reports detailing the activities of the Department's detective division. The Prosecutor's Office concluded that it was "obvious that the accomplishments cited ... for each month varied greatly from the amount of work actually performed by the bureau." Filed reports, moreover, were available for only 31 of the 747 cases assigned to the Roselle Detective Bureau as a whole. The Prosecutor's investigation also produced evidence of a long-standing failure to follow up on reports of domestic violence. Indeed, the Department had no records whatsoever of crimes involving domestic violence. Grabowski later stated that he never had filed a domestic violence report and could not recall informing specific victims of domestic violence of their rights under the Domestic Violence Act.

Following Evans' death, her sister and personal representative, Regina Brown, brought this five-count civil rights action. The first four counts, bottomed on 42 U.S.C. § 1983, allege that defendants, including Detective Grabowski, Patrolman Schwartz, Chief Trolan (in both individual and official capacities), the Roselle Police Department, and the Borough of Roselle, violated Evans' constitutional rights. The first count alleges that Grabowski and Schwartz, through failing either to file criminal charges against McKenzie or to assist Evans in obtaining the restraining order available to her under the New Jersey Domestic Violence Act, unlawfully interfered with and denied Evans her constitutional right of access to the judicial system. The second count alleges that Grabowski and Schwartz, by breaching an affirmative duty of protection that arose from a special relationship with Evans, violated her constitutional right to due pro-

you in applying for this order. You also have the right to go to court and file a criminal complaint.

"On weekends, holidays, and other times when the courts are closed, you may go to the municipal court for an emergency order granting the relief set forth above."
N.J.Stat.Ann. § 2C:25–7 (1982).

cess. The third count alleges that Grabowski and Schwartz afforded Evans inadequate protection because she was a victim of domestic violence and thereby violated her constitutional right to equal protection. The fourth count, which names as defendants Chief Trolan, in both his individual and official capacities, the Roselle Police Department, and the Borough of Roselle, alleges that these defendants, through deliberate indifference to the consequences of failing to train and supervise their officers adequately, violated Evans' right of access to the judicial system, as well as her other due process and equal protection rights. The fifth count asserts pendent tort claims under New Jersey common law.

After a period of discovery, Grabowski and Schwartz moved for summary judgment on all five counts of plaintiff's complaint. The district court held that these defendants were entitled to summary judgment on count two of the complaint based upon *DeShaney*, 109 S.Ct. at 998. Under *DeShaney*, the state has a "special relationship" with an individual, creating a constitutionally enforceable duty of protection, only when it has deprived that individual of liberty and, thus, the freedom to act on his or her own behalf. The court concluded that no such special relationship existed with respect to Evans. Plaintiff appeals the grant of summary judgment for defendants on this claim.

The district court dealt with the court access claim in count one of the complaint in two separate proceedings. In an early proceeding on defendants' motions to dismiss various claims, the district court drew a distinction between Evans' alleged constitutional right to bring criminal charges and her asserted constitutional right, arising from state legislation coupled with the right to due process, to receive assistance in bringing a civil action. The district court dismissed the component of count one alleging that Grabowski and Schwartz denied Evans' right of access to the criminal courts, emphasizing that, under *Linda R.S. v. Richard D.*, 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973), a private citizen clearly lacks a judicially cognizable interest in the criminal prosecution of another. The court held, however, that plaintiff stated a cognizable claim that Evans was denied her constitutional right of access to the *civil* courts and therefore did not dismiss count one in its entirety.

In the proceeding on the motions for summary judgment, the district court denied defendants' claim of qualified immunity with respect to the civil court access claim. The district court held that New Jersey's Prevention of Domestic Violence Act, in tandem with the due process clause of the fourteenth amendment, creates a constitutional right on the part of victims of domestic violence to receive police assistance in gaining civil court access and that Evans' situation clearly fell within the ambit of the Domestic Violence Act. The court further held that Grabowski's and Schwartz's knowledge of Evans' danger, in conjunction with general publicity about the plight of victims of domestic violence, was sufficient to put these defendants on notice that they had a constitutional duty to assist Evans in gaining access to the civil courts. The court concluded that this notice barred them from obtaining summary judgment on qualified immunity grounds.

The district court also held that plaintiff had adduced sufficient evidence of a pattern of deliberate indifference or a discriminatory policy or custom directed toward victims of domestic violence to survive defendants' motion for summary judgment on her equal protection claim. Additionally, the district court ruled against defendants on their motion for summary judgment raising the defense of qualified immunity to this claim, concluding that plaintiff's allegations of a pattern of discrimination on the part of Grabowski and Schwartz against victims of domestic violence could permit an inference of their intent to discriminate.

The court next considered whether summary judgment should be granted on plaintiff's claim that the Roselle Police Department, the Borough of Roselle, and Chief Trolan, in both his individual and official capacities, ultimately are liable for the deprivation of Evans' constitutional rights.

The court concluded that because plaintiff had sufficiently substantiated her allegation that the misconduct of Schwartz and Grabowski was both causally connected to Evans' death and attributable to a municipal plan or policy evincing deliberate indifference to the constitutional rights of domestic violence victims, defendants were not entitled to summary judgment on this claim.

Finally, the district court held that summary judgment should not be granted for defendants on plaintiff's pendent state claim that Chief Trolan, the Roselle Police Department, and the Borough of Roselle caused Evans' death through a negligent and wanton disregard for her safety that amounted to a breach of their duty to protect her. The court concluded that defendants' investigative and protective duties to Evans were of a ministerial type not shielded by New Jersey's Tort Claims Act. The court further concluded that, notwithstanding sections of the Tort Claims Act shielding discretionary decisions concerning arrests and the provision of police protection, the Domestic Violence Act subjected defendants to potential liability for failure to perform the nondiscretionary functions of ensuring that Evans knew her rights as a victim of domestic violence and of providing her with any necessary assistance in securing court protection.

## II. APPELLATE JURISDICTION

█ It is clear that we have jurisdiction over the interlocutory appeals of Grabowski, Schwartz, and Trolan, sued in his individual capacity, based upon the defense of qualified immunity that these defendants have asserted in response to plaintiff's civil court access, equal protection, and deliberate indifference claims. Under *Mitchell*, 472 U.S. 511, 105 S.Ct. 2806, which holds that qualified immunity from federal claims encompasses not only immunity from liability, but also immunity from suit, a decision denying a claim of qualified immunity, and thereby vitiating the entitlement not to stand trial, is immediately appealable.

█ Equally clearly, we lack jurisdiction over the appeals by Chief Trolan, in his official capacity, the Roselle Police Department, and the Borough of Roselle from the district court's refusal to grant summary judgment on plaintiff's claim that these defendants denied Evans her constitutional rights through failing to train and supervise their police officers adequately. Denials of motions for summary judgment generally are not final orders. *United States v. Spears*, 859 F.2d 284, 286 (3d Cir.1988); *see Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949) (enunciating collateral order doctrine applicable to a "small class" of cases, but emphasizing that 28 U.S.C. § 1291 generally does not "permit appeals, even from fully consummated decisions, where they are but steps towards final judgment in which they will merge"). The Borough of Roselle is the real party in interest with respect to plaintiff's claims against Chief Trolan, in his official capacity, and the Roselle Police Department, and the Borough cannot assert a qualified immunity defense so as to qualify, under *Mitchell*, for review of the district court's summary judgment ruling. *See Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (under section 1983, a municipality has no immunity from liability for violations of constitutional rights).

█ It is clear, in addition, that we lack jurisdiction to review: (1) the district court's dismissal of the component of plaintiff's court access claim that alleges that Grabowski and Schwartz denied Evans' constitutional right of access to the criminal courts; and (2) the district court's grant of summary judgment for Grabowski and Schwartz on plaintiff's claim that the officers violated Evans' right to due process by breaching their duty to protect her. Other claims remain pending in the district court, and plaintiff did not obtain certification with respect to either claim under Rule 54(b), even if she could have done so. *See* Fed.R.Civ.P. 54(b) (requiring an "express determination" that fewer than all claims

in action may be appealed and an "express direction" for entry of judgment).[3]

Whether we have jurisdiction to review the district court's denial of qualified immunity to defendants on plaintiff's pendent state tort claims is a much more difficult question. This overarching question actually devolves into two inquiries: (1) a predicate inquiry into whether the federal law of qualified official immunity ultimately governs appealability in this instance; and (2) a subsequent inquiry into the nature of the qualified immunity that New Jersey law confers upon state officials.

■ The Supreme Court's decision in *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988), necessitates our predicate inquiry. In *Budinich*, the Supreme Court held that the procedural rule of finality of 28 U.S.C. § 1291—not rules of finality supplied by state law—should govern appealability even in diversity cases. One implication of the Court's decision in *Budinich* is that our decision on the appealability of the district court's denial of defendants' motion for summary judgment should be governed solely by section 1291 as interpreted in *Mitchell*.

As we have noted, *Mitchell* holds that qualified official immunity with respect to federal statutory and constitutional claims constitutes an immunity from suit, as well as a defense to ultimate liability. In contrast to decisions that solely concern immunity as a defense to liability, decisions that concern immunity from suit fall within the small class of appealable decisions, carved out by *Cohen*, 337 U.S. at 546, 69 S.Ct. at 1225, that "finally determine claims of right separable from, and collateral to,

rights asserted in the action." *See Mitchell*, 472 U.S. at 527–29, 105 S.Ct. at 2816–17. A decision denying summary judgment to an official asserting immunity from both litigation and liability in response to a federal claim, like a decision denying summary judgment on a double-jeopardy claim of right not to stand trial, *see Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), involves "a right [that] cannot be effectively vindicated after the trial has occurred." *Mitchell*, 472 U.S. at 525, 105 S.Ct. at 2815. This is because "the essence of [such] immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." *Id.*

The Fifth and Sixth Circuits have considered the possibility that *Mitchell*'s doctrine of appealability should govern in federal cases, like this case, that involve denials of claims of qualified official immunity based upon *state* law. *See Sorey v. Kellett*, 849 F.2d 960 (5th Cir.1988); *Marrical v. Detroit News, Inc.*, 805 F.2d 169 (6th Cir.1986). As both circuits noted, the parties in a diversity action, or in a federal action such as this one involving pendent state claims, are bound by federal procedural rules governing appeals, including the collateral order doctrine. *Sorey*, 849 F.2d at 962; *Marrical*, 805 F.2d at 172; *see Budinich*, 108 S.Ct. at 1717; *Cohen*, 337 U.S. at 541, 69 S.Ct. at 1224. However, we agree with each circuit that a *Mitchell* analysis, coupled with the teaching of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), dictates that

> the right to an interlocutory appeal from the denial of a claim of absolute or qualified immunity under state law can only

---

**3.** The doctrine of pendent appellate jurisdiction also fails to supply the missing jurisdictional ground for reviewing the district court's decisions as to these claims. Under this doctrine, an appellate court may assert jurisdiction over a claim that neither is certified pursuant to Fed.R. Civ.P. 54(b) nor falls within the small class of claims covered by the collateral order doctrine only if the claim is inextricably intertwined with another claim over which the court properly has jurisdiction. *See Kershner v. Mazurkiewicz*, 670 F.2d 440, 449 (3d Cir.1982) (holding pendent class certification order appealable under doc-

trine of pendent appellate jurisdiction only if "inextricably bound" to related issue appealable pursuant to 28 U.S.C. § 1292). Defendants' appeal asserting qualified immunity with respect to plaintiff's civil court access claim may be resolved without reference to the propriety of the district court's decision to dismiss plaintiff's related criminal court access claim. We also need not analyze the district court's decision to grant summary judgment for the defendants on plaintiff's due process claim in order to resolve the other appeals over which we have concluded we have jurisdiction.

exist where the state has extended an underlying substantive right to be free from the burdens of litigation arising from acts taken in the course of [official] duties.

*Marrical*, 805 F.2d at 172; *see also Sorey*, 849 F.2d at 962 (quoting and agreeing with above reasoning).

Our conclusion that the denial of a claim of qualified immunity premised upon state law is appealable only if the state has conferred an underlying substantive immunity from suits arising from the performance of official duties consequently necessitates an inquiry into whether New Jersey extends such an immunity to its officials. We must seek an answer to this question in New Jersey's Tort Claims Act and the cases that construe it. We think that we also may look to New Jersey's doctrine and procedural rules concerning interlocutory appeals in resolving this question. Although, as we have emphasized, federal procedural rules govern appealability in federal cases such as this one, New Jersey law concerning interlocutory appeals is useful insofar as it sheds light on whether a substantive immunity from suit exists for officials under New Jersey statutory and common law. *See Sorey*, 849 F.2d at 962 (concluding that state procedural rules were useful for same purpose).

Unfortunately neither the text of the New Jersey Tort Claims Act nor New Jersey case law directly addresses the substantive issue whether state officials possess qualified immunity from suit or may only assert qualified immunity as a defense

to liability.[4] In order to determine whether New Jersey law provides state officials with immunity from litigation, therefore, we must look to these two sources of New Jersey law and draw inferences from the policies that they express.

The policies undergirding the Supreme Court's decision in *Mitchell* arguably can be discerned in the New Jersey Tort Claims Act. The price of refusing to confer upon public officials immunity from suit as well as from ultimate liability for their reasonable actions is high. In the words of the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1981), quoted at length in *Mitchell*, this price includes " 'the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.' " *Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815. The Task Force on the Tort Claims Act may implicitly have recognized these "costs" when it acknowledged a hand-in-glove relationship between effective government and official immunity from suit for discretionary decisions [5] and declared that " 'it cannot be a tort for the government to govern.' " N.J. Stat.Ann. 59:2–3 Task Force Comment (quoting *Amelchenko v. Freehold Borough*, 42 N.J. 541, 550, 201 A.2d 726, 731 (1964)).[6]

That the Tort Claims Act was intended to confer a *Mitchell*-type immunity from suit upon public officials might also logically be

---

**4.** We also note that no case law on this point has evolved under California's Tort Claims Act, on which the New Jersey Act was based. *See Rochinsky v. State of N.J. Dep't of Transp.*, 110 N.J. 399, 407, 541 A.2d 1029, 1033 (1988) (observing that in various sections of its Tort Claims Act, New Jersey expressly adopted reasoning embodied in the California Tort Claims Act); *Lee v. Doe*, 232 N.J.Super. 569, 581, 557 A.2d 1045, 1050 (1989) (same).

**5.** To the extent that the Tort Claims Act is intended to confer official immunity, it seems primarily intended to confer such immunity for discretionary, as opposed to ministerial, actions. The New Jersey Supreme Court has held, however, that immunity for some ministerial acts exists under state law. *Rochinsky*, 110 N.J. at

1029, 541 A.2d at 1029; *see, e.g., Malloy v. State*, 76 N.J. 515, 388 A.2d 622 (1978) (interpreting N.J.Stat.Ann. 59:2–5, which confers immunity upon public entities for potential liability arising from the issuance, denial, suspension, or revocation of permits and licenses); *Wuethrich v. Delia*, 155 N.J.Super. 324, 382 A.2d 929, *certif. denied*, 77 N.J. 486, 391 A.2d 500 (1978) (construing N.J.Stat.Ann. 59:5–4 and 5–5, respectively concerning immunity from liability for failure to provide police protection and failure to make an arrest).

**6.** The Task Force Comments on the Tort Claims Act have the precedential weight and value of legislative history. *Rochinsky*, 110 N.J. at 407 n. 4, 541 A.2d at 1033 n. 4.

inferred from the Act's primary and secondary purposes. The New Jersey Supreme Court has emphasized that "the plain meaning of [the statute] firmly establishes that 'immunity is the dominant consideration of the Act.'" *Rochinsky*, 110 N.J. at 408, 541 A.2d at 1034 (citation omitted). In light of this overriding purpose, the inference that the Act also confers immunity from having to litigate the consequences of reasonable actions seems strong.

The secondary purpose of the Act is to protect against "actions brought in hopes of imposing liability on theories not yet tested in the courts [that] could result in greatly expanding the amount of litigation and the attendant expense which public entities would face." N.J.Stat.Ann. 59:2–1 Task Force Comment. *See also Ayers v. Jackson Township*, 106 N.J. 557, 598, 525 A.2d 287, 308 (1987), (emphasizing Act's goal of deterring novel causes of action against public entities in declining to recognize plaintiffs' cause of action for unquantified enhanced risk of disease). Because public entities and officials may incur considerable expense defending against claims for which they ultimately are not found liable, interpreting the Act to confer immunity from suit, in addition to immunity from liability, would seem consistent with this policy of deterring novel causes of action.[7]

The Tort Claims Act's dominant consideration of immunity and policy of deterrence are equally consistent, however, with the view that the Act was intended to shield public officials and entities only from ultimate liability—and *not* initially from suit. Neither the language of the Act nor its legislative history directly addresses the immunity from suit concerns of *Mitchell* that we previously have discussed. Indeed, all of the many sections of the Act that provide for or negate the immunity of public entities and employees speak solely in terms of immunity from liability and not of immunity from suit. *See, e.g.,* N.J.Stat. Ann. 59:2–2 (public entity "is not liable" for injury caused by adopting or failing to adopt or enforce any law); N.J.Stat.Ann. 59:3–10 (public employee acting in scope of employment "is not liable" for injury caused by misrepresentation); N.J.Stat. Ann. 59:4–8 (neither public entity nor public employee "is liable" for injury caused by condition of any unimproved public property).

New Jersey cases construing the Tort Claims Act also are consistent with the view that the Act was not intended to confer immunity from litigation upon the state's public officials. Although none of these cases address the *Mitchell* issue of immunity from suit, it seems noteworthy that they do speak explicitly in terms of immunity from *liability*. *See, e.g.,* *Rochinsky*, 110 N.J. at 408, 541 A.2d at 1034 ("Even when one of the Act's provisions establishes liability, that liability is ordinarily negated if the public entity possesses a corresponding immunity."); *Lee v. Doe*, 232 N.J.Super. 569, 581, 557 A.2d 1045, 1052 (1989) (interpreting section of Act concerning immunity for failure to provide police protection, and corresponding section of the California act on which it was based, to require "grant of immunity from liability").

The stated purpose and policy underlying the Tort Claims Act, as well as the cases construing it, may therefore be interpreted to cut against the view that the Act confers a *Mitchell*-type immunity from suit upon public officials and entities. That the Tort Claims Act and its accompanying case law may be interpreted both to support and not to support a *Mitchell* immunity from suit does not cut powerfully enough against the possibility that the Act provides for a *Mitchell*-type immunity to decide the issue for us. Another factor, however, does.

---

**7.** We note in this regard that public entities, under New Jersey law, are obligated to defend police officers in suits arising from actions taken within the course of the officers' employment. *See* N.J.Stat.Ann. 40A:14–155; N.J.Stat. Ann. 59:10–4. Interpreting the Act to confer immunity from suit upon such officers, at least insofar as they are named as defendants in causes of action based on untested theories of liability, could spare public entities the costs of fully defending such suits.

As we have noted, New Jersey's procedural law concerning interlocutory appeals is relevant to our analysis insofar as it reveals whether a qualified immunity from suit, and therefore the right, provided for in *Mitchell*, to appeal an effective denial of this immunity, exists under New Jersey statutory and common law. Had a New Jersey court denied defendants' motion for summary judgment on plaintiff's tort claims, defendants could obtain appeal only by means of an interlocutory order and a motion for leave to appeal to the Appellate Division of the New Jersey Superior Court. *See* N.J.Ct.R. 2:2–4. In New Jersey, the power to grant leave to appeal interlocutory orders is "highly discretionary" and "exercised only sparingly" by New Jersey's appellate courts. *State v. Reldan*, 100 N.J. 187, 205, 495 A.2d 76, 86 (1985); *see also* Pressler, Current N.J. Court Rules, Comment 2:2–4. Indeed, a Justice of the New Jersey Supreme Court has observed that the New Jersey court rules reflect a policy that disfavors piecemeal reviews, has cautioned that "[i]nterlocutory review is exercised only in extraordinary cases," and has characterized the attitude of the state's courts toward most interlocutory appeals as "inhospitable." Clifford, *Civil Interlocutory Appellate Review in New Jersey*, 47 Law & Contemp. Probs. 87 (Summer 1984).

We conclude that the New Jersey courts' general reluctance to entertain interlocutory appeals, in tandem with the absence of the clear expression of *Mitchell* concerns in either the Tort Claims Act or the state's case law, tips the balance toward non-ap-

pealability of the district court's denial of summary judgment for defendants on plaintiff's pendent claims.[8] We therefore will dismiss for lack of appellate jurisdiction defendants' appeals, based on the defense of qualified immunity under the New Jersey Tort Claims Act, from the district court's refusal to grant them summary judgment on plaintiff's pendent state claims.

## III. THE MERITS OF THE SUMMARY JUDGMENT MOTIONS

### A. *Qualified Official Immunity and Standards for Summary Judgment*

In reviewing the district court's rulings on defendants' motions for summary judgment alleging qualified official immunity with respect to plaintiff's *federal* claims, we must apply the doctrine of qualified immunity and the summary judgment standards that have evolved under federal law. An appellate court reviewing the denial of a defendant's claim of qualified immunity must inquire "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." *Mitchell*, 472 U.S. at 528, 105 S.Ct. at 2816. The *Harlow* Court held that this inquiry is an objective inquiry into whether the challenged official conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738. In *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), the Su-

---

8. In *Sorey*, a section 1983 action involving a pendent claim governed by Mississippi law, the Fifth Circuit reversed the district court's denial of defendants' motion for summary judgment based upon qualified immunity under state law. 849 F.2d at 961. As in this case, the state's courts had not directly considered whether, under state law, qualified immunity comprehended immunity from suit or merely constituted a defense to liability. The *Sorey* court, however, emphasized the state's common law rule that a successful defense of qualified immunity entitles an official to dismissal before trial. *Id.* at 962. The *Sorey* court also observed that the Mississippi Supreme Court had accepted interlocutory appeals of denials of immunity-based motions for summary judgment through a certi-

fication process similar to 28 U.S.C. § 1292(b). *Id.* As we have discussed, the New Jersey courts have evolved no such common law rule and are quite inhospitable to interlocutory appeals.

We think that this case is more similar to *Marrical*, 805 F.2d at 169, in which the Sixth Circuit dismissed an appeal in a diversity action from a denial of a motion for summary judgment asserting qualified official immunity. The *Marrical* court noted that Michigan state courts were aware of the distinction drawn between immunity from suit and immunity from liability and concluded that there was "no reason to believe the Michigan Supreme Court ... intended to afford state officers immunity from suit as well as from liability." *Id.* at 173.

preme Court further articulated this objective standard, holding that "[t]he contours of the right [allegedly violated] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

Although *Mitchell, Harlow,* and *Anderson* clearly define the nature of our analysis in reviewing the district court's denial of defendants' claims of qualified immunity, these cases less clearly define the scope of our review. Our inquiry into whether Evans' asserted constitutional right of access to the civil courts was established with the requisite clarity at the time defendants allegedly violated it, for example, would seem to encompass inquiry into whether the right was recognized at all. The First Circuit has opined in dicta, however, that *Mitchell* so circumscribes the scope of appellate review that a reviewing court may not " 'even determine whether the plaintiff's allegations actually state a claim.' " *Bonitz v. Fair,* 804 F.2d 164, 166 (1st Cir.1986) (quoting *Mitchell,* 472 U.S. at 528, 105 S.Ct. at 2816), *overruled on other grounds, Unwin v. Campbell,* 863 F.2d 124, 131 (1st Cir.1988). From this perspective, we would have to confine our inquiry strictly to whether the right that Grabowski and Schwartz allegedly violated was clearly established and could not consider whether Evans' putative right was established in the first place.

We believe, however, that such a reading of *Mitchell* is unduly narrow. The *Mitchell* Court stated only that an appellate court reviewing the denial of a defendant's claim of qualified immunity "need not" consider whether the plaintiff stated a cognizable claim. 472 U.S. at 528, 105 S.Ct. at 2816. *Mitchell* therefore did not hold that a reviewing court may not address this issue, and properly so, for the inquiry that *Mitchell* mandates into whether the rights that a defendant official is alleged to have violated were clearly established at the time of his challenged actions may have to devolve into an inquiry into whether the legal norms that the defendant is alleged to have violated were recognized at all. *See id.; cf. Chinchello v. Fenton,* 805 F.2d 126, 132 (3d Cir.1986) (suggesting that, although "the qualified immunity issue may be said to overlap with the legal issue on the merits" when defendant's alleged conduct in no way breaches a rule of liability, immunity issue may nonetheless be sufficiently conceptually distinct to permit review). Indeed, it strikes us as both illogical and contrary to the interests of judicial economy to construe *Mitchell* to require that when a reviewing court determines that a constitutional right allegedly violated could not have been clearly established because it has not been recognized, the court may not directly so hold. We believe, therefore, that we properly address *infra* the issue whether plaintiff's allegation that Grabowski and Schwartz violated Evans' constitutional right to receive assistance in gaining access to the civil courts ultimately is constitutionally cognizable.

■ An additional issue pertaining to the scope of our review of the district court's decisions denying immunity is whether we may look beyond the allegations of plaintiff's complaint to the pre-trial record in determining whether the district court properly denied defendants' immunity-based motions for summary judgment. The propriety of such a relatively expansive review has been open to doubt. *Compare Turner v. Dammon,* 848 F.2d 440, 444 (4th Cir.1988) (holding that, in determining whether claim of qualified immunity to section 1983 suit properly was denied, court of appeals should not confine itself to allegations in complaint, but also should inquire " 'whether ... there is a genuine issue, triable to a jury,' of a clearly established constitutional violation") (citation omitted) *with Bonitz,* 804 F.2d at 164 (holding that, on appeal of denial of claim of qualified immunity to section 1983 liability, review may encompass only allegations of plaintiff's complaint and not facts adduced as to defendant's conduct); *See also Chinchello,* 805 F.2d at 130–31 (flagging, but not resolving, issue whether appellate court reviewing denial of claim of immunity may consider whether material dispute of fact exists).

*Anderson,* however, established a standard of review of denials of qualified im-

munity that requires analysis not only of the clear establishment of the right that an official is alleged to have violated, but also of the specific official *actions* alleged to have violated the right. *See* 483 U.S. at 640, 107 S.Ct. at 3039. *Anderson* thus appears to require a court faced with whether a claim of qualified immunity properly was denied to engage in an analysis of the facts adduced concerning the conduct of the official who claims immunity. *See Unwin*, 863 F.2d at 131 (holding that *Anderson*'s " 'fact-specific' " inquiry necessitated overruling previous circuit precedent holding that, on appeal of a denial of qualified immunity, court may look only to allegations set forth in plaintiff's complaint and not to pre-trial record concerning defendant's conduct).

Although we have not previously addressed this issue explicitly, we believe that we implicitly have held that *Anderson* requires appellate inquiry into whether the plaintiff has adduced evidence sufficient to create a genuine issue of material fact as to whether the defendant official engaged in the conduct alleged to have violated a clearly established right. *See Good v. Dauphin County Social Services for Children and Youth*, 891 F.2d 1087, 1092, 1096–97 (3d Cir.1989) (citing *Anderson* and holding, *inter alia,* that a defendant was entitled to qualified immunity due to insufficient evidence that she engaged in conduct violative of clearly established constitutional right); *Stoneking v. Bradford Area School District*, 882 F.2d 720 (3d Cir.1989) (citing *Anderson* in holding that " 'fact-specific' " inquiry was required into whether defendants were entitled to assert qualified immunity as defense to section 1983 action), *cert. denied,* —— U.S. ——, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). We conclude that under *Anderson*'s fact specific standard for qualified immunity, as construed and applied by our precedents, we must determine whether the district court properly denied defendants' claims of qualified immunity in part by analyzing the

evidence adduced by plaintiff as to the conduct of the defendants.

This evidentiary analysis is governed by the Supreme Court's trilogy of cases [9] defining the quantum of evidence sufficient to enable a nonmoving party to survive a motion for summary judgment. The trilogy's basic rule is that a motion for summary judgment will not succeed "if the dispute about a material fact is 'genuine.' " *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. This standard, which mirrors the standard for directing a verdict, requires an inquiry into "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2511–12.

**B. *Count One: Right of Access to the Civil Courts—Was Summary Judgment Properly Denied?***

■ In count one, plaintiff alleges that Officer Schwartz and Detective Grabowski unlawfully interfered with and ultimately denied Evans her constitutional right of access to the civil courts. We note preliminarily that an individual's constitutional right of access to the courts is well settled. *See Chambers v. Baltimore & Ohio Railroad*, 207 U.S. 142, 28 S.Ct. 34, 52 L.Ed. 143 (1907) (deriving such right, in context of analyzing state wrongful death statute, from article four privileges and immunities clause and fourteenth amendment); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (fourteenth amendment due process clause assures citizens access to courts to present allegations that fundamental constitutional rights have been violated); *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (first amendment rights of association encompass right of access to agencies and courts to be heard on applications for operating rights sought by competitors). A deprivation of the constitutional right of access to the courts clearly is actionable under sec-

---

**9.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Co.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

tion 1983. *See, e.g., Abdul–Akbar v. Watson,* 901 F.2d 329 (3d Cir.) (holding that district court's denial of prisoner's sixth amendment right of meaningful access to the courts was actionable under section 1983).

Plaintiff maintains that Grabowski and Schwartz denied Evans her constitutional right of access to the civil courts by failing to inform her adequately of her rights under New Jersey law. Plaintiff grounds this claim in Schwartz's and Grabowski's alleged violations of New Jersey's Domestic Violence Act, which directs police officers to inform a victim of domestic violence of her right to obtain at any time a temporary restraining order against her attacker in civil court. N.J.Stat.Ann. § 2C:25–7. The crux of plaintiff's contention is that the Act spells out a way in which the right of access to the courts, constitutionally guaranteed and enforceable through 42 U.S.C. § 1983, may be protected. The district court, agreeing with the plaintiff, more fully delineated this position. The court concluded that the Act, from a constitutional perspective, does more for victims of domestic violence than simply to highlight for them the right of access to the courts. The court held, rather, that the Act, coupled with the constitutionally protected right of access to the courts, creates for New Jersey victims of domestic violence an expansive due process right to receive assistance in gaining civil court access.

In denying defendants' motions for summary judgment, the district court looked both to the Domestic Violence Act and to *Thurman v. City of Torrington,* 595 F.Supp. 1521 (D.Conn.1984), a case in which a court applied equal protection scrutiny to police conduct in the context of domestic abuse. The district court emphasized, in particular, that the events in this case occurred four years after the New Jersey legislature enacted the Domestic Violence Act and three years after the Act became law. On the basis of the Act and the *Thurman* case, the court held that a due process right to receive assistance in gaining court access was, as required by *Mitchell, Harlow,* and *Anderson,* both clearly

established and definite in its contours at the time that the events in this case transpired. Concluding that the record did not establish "that Schwartz and Grabowski operated independently" and that plaintiff had raised genuine issues of material fact as to whether the two officers had violated Evans' right to receive assistance in gaining access to the civil courts, the court denied summary judgment to defendants on plaintiff's civil court access claim.

Schwartz challenges the district court's denial of his qualified immunity defense to plaintiff's civil court access claim primarily on factual grounds. Schwartz asserts that his contact with Evans was fleeting and merely prefatory to her contact with Grabowski, the officer assigned to her case. Schwartz in substance contends that plaintiff can adduce no evidence to show that he reasonably could have known that the Domestic Violence Act applied to Evans' situation, much less incurred any obligation to assist her in obtaining access to the family court to obtain a restraining order against McKenzie. Grabowski challenges the denial of his qualified immunity defense to the civil court access claim primarily on legal grounds. Grabowski concedes that he failed to fulfill his obligations under the Domestic Violence Act. He asserts, however, that his failure to fulfill his obligations under the Act did not amount to a denial of Evans' constitutional right of access to the civil courts. The two defendants together ask us to hold that Evans had no constitutional right to receive assistance in gaining access to the courts—in essence, that plaintiff failed to state a cognizable constitutional claim. They also ask us to hold that plaintiff has established no genuine issue of material fact as to whether they acted to violate Evans' existing and circumscribed constitutional right of access to the civil courts.

■■■■ Turning first to the issue whether Evans possessed a clearly established constitutional right—or any recognized constitutional right at all—to receive assistance in gaining access to the civil courts, it is certain that a violation of New Jersey's Domestic Violence Act, standing

alone, is insufficient to give rise to a statutory or constitutional claim under 42 U.S.C. § 1983. The plain language of section 1983, interpreted and underscored by the Supreme Court in *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), solely supports causes of action based upon violations, under the color of state law, of *federal* statutory law or constitutional rights. Section 1983 does not provide a cause of action for violations of state statutes, and, as the district court observed, a state statute cannot, in and of itself, create a constitutional right. *See Philadelphia Police and Fire Association for Handicapped Children, Inc. v. City of Philadelphia,* 874 F.2d 156, 166–68 (3d Cir. 1989). In *Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984), moreover, the Supreme Court held that "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some [state] statutory or administrative provision." We believe that *Davis,* in tandem with the previous cases, renders the Domestic Violence Act effectively irrelevant to analysis of whether Evans, at the time of her encounter with Grabowski, had a clearly established *constitutional* right to receive assistance in gaining access to the civil courts. As a matter of law, therefore, plaintiff's intertwined claim of violations of Evans' statutory rights under the Domestic Violence Act and of her constitutional right of access to the courts is cognizable under section 1983 only if this constitutional right is expansive enough to encompass the state statutory rights.

The due process clause of the fourteenth amendment imposes upon state actors an obligation to refrain from preventing individuals from obtaining access to the civil courts. *See Wolff,* 418 U.S. at 578–79, 94 S.Ct. at 2985–86; *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *see also Bell v. City of Milwaukee,* 746 F.2d 1205, 1260–61 (7th Cir.1984); *Ryland v. Shapiro,* 708 F.2d 967, 972 (5th Cir.1983). But only when the state has custody of an individual must its actors, to ensure that the individual receives due process, provide assistance in gaining access to the courts. *See Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (fundamental right of access to the courts requires prison authorities to assist inmates in preparation and filing of meaningful legal papers); *cf. Wolff,* 418 U.S. at 578–80, 94 S.Ct. at 2985–87 (fundamental right of access to the courts bars prison authorities from prohibiting inmates from providing assistance to one another in preparing civil rights actions).[10] Evans' constitutional right of access to the civil courts, therefore, does not appear expansive enough to encompass the right to receive assistance in gaining court access accorded to her by New Jersey's Domestic Violence Act.

Plaintiff's combined statutory and constitutional claim is, at core, coterminous with her claim that Grabowski and Schwartz violated Evans' due process right to police protection, on which the district court granted summary judgment for the defendants. Each claim ultimately is governed by the Supreme Court's decision in *DeShaney,* which we applied in *Philadelphia Police and Fire Association,* 874 F.2d at 156. *DeShaney* establishes a line, conceptually distinct, although sometimes difficult to draw, between a state's obligation to refrain from depriving its citizens of life, liberty, or property without due process of law, and a state's affirmative obligation to protect its citizens from such deprivations at the hands of private actors. *DeShaney,* 109 S.Ct. at 1002–04, 1008–09. *DeShaney* held that in the absence of an affirmative exercise of state power that "so restrains an individual's liberty that it

---

10. The constitutional right of access to the courts also comprehends a right to learn facts necessary to seek redress for constitutional violations of individual rights. *Bell,* 746 F.2d at 1205; *Ryland,* 708 F.2d at 967. For the indigent, this constitutional right may encompass a right not to have to pay legal fees that could bar them from asserting basic rights. *See Boddie,* 401 U.S. at 371, 91 S.Ct. at 783 (due process clause prohibits state from denying individuals unable to pay required fees their right of access to civil courts to obtain dissolution of marriage).

renders him unable to care for himself," a state has no positive duty to ensure that the individual's life, liberty, or property "do not come to harm through other [than state] means." *Id.* at 1005, 1003.[11] As we stated in *Philadelphia Police and Fire Association,* "*DeShaney* begins with the proposition that in general the due process clause only restricts state action; it does not obligate the state to protect its citizens from one another." 874 F.2d at 167.

Plaintiff in substance responds that the Domestic Violence Act, which clearly was applicable to Evans' situation, created a relationship akin to custody between Evans and officers Grabowski and Schwartz, thus constituting an exception to the general rule enunciated in *DeShaney* and obligating the officers to provide Evans with assistance in gaining access to the civil courts. The dissent in *DeShaney* indeed urged that statutory or other action taken by a state to protect a class to which an individual belongs constitutes the most appropriate vantage point from which to begin analyzing whether a state unconstitutionally deprived an individual of due process rights. 109 S.Ct. at 1008–09 (Brennan, J., dissenting). From this perspective, "a State may be found complicit in an injury even if it did not create the situation that caused the harm." *Id.* at 1009. This, however, was not the perspective adopted by the *DeShaney* majority, whose holding we were constrained to follow in *Philadelphia Police and Fire Association* and are constrained to follow now.

The plaintiffs in *Philadelphia Police and Fire Association* contended, similarly to the plaintiff in this case, that the operation of a Pennsylvania statute, which provided that all mentally retarded citizens would receive adequate services, created a special relationship between the state and these citizens, obligating the state to continue its protection of them. 874 F.2d at 166. We noted in *Philadelphia Police* that a protective statute also underlay the plaintiff's claim in *DeShaney.* *Id.* In words equally applicable to this case, we held that the "cessation of action by the state ... in no way differs from the *DeShaney* situation. Just as in *DeShaney,* the retraction of state intervention permits the harm, but the harm in each case actively is caused by a source other than the state." *Id.* at 167.

Plaintiff's allegation that the Domestic Violence Act and the constitutional right of access to the civil courts together gave Evans a constitutional right to receive assistance in gaining civil court access, therefore, does not constitute a cognizable constitutional claim under section 1983. Plaintiff appears further to contend, however, that even if the Domestic Violence Act and the due process clause did not create for Evans a right to receive assistance in gaining civil court access, Grabowski and Schwartz, through their actions, did create such a right. Plaintiff points to the *DeShaney* Court's holding that a state may incur an affirmative duty to assist or protect an individual, if it imposes limitations "on his freedom to act on his own behalf." 109 S.Ct. at 1006. Plaintiff argues that there are strong factual analogies between this case and cases in which courts have premised a state actor's constitutional liability for the failure to provide adequate assistance or protection upon the state's special relationship to an individual or its role creating a special danger to the individual from a private actor. Plaintiff re-

**11.** In *DeShaney,* a mother, on behalf of her infant son, brought a section 1983 action alleging that the Winnebago Department of Social Services had deprived the son of his liberty interest in bodily integrity in violation of his substantive due process rights under the fourteenth amendment. *Id.* at 1002. For more than a year, the Department of Social Services had received, from hospital personnel and those who knew the child, information strongly suggesting that his father was abusing him. *Id.* at 1001–02. Due to his father's continual beatings, the child sustained brain damage so severe that he fell into a life-threatening coma and is now profoundly retarded. *Id.* at 1002. The child's mother contended that the Department, because it should have been or actually was aware of the danger to her child, had a constitutional obligation to intervene to protect him from his father. *Id.* The Supreme Court, however, emphasized that the father—not the Department of Social Services—had harmed the child and held that the Department's failure to provide the child with adequate protection did not amount to a deprivation of his due process rights. *Id.* at 1007.

lies, in particular, upon two recent cases decided by other circuits—*Cornelius v. Town of Highland Lake, Alabama,* 880 F.2d 348 (11th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990), and *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989), *cert. denied,* — U.S. —, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990).

In *Cornelius,* two prisoners assigned to a community work squad abducted the plaintiff from the town hall where she worked and held her hostage for a period of three days, during which they repeatedly threatened to sexually assault and kill her. 880 at 350. The plaintiff brought a section 1983 action against the town, several of its officials, and members of the state department of corrections, alleging that they had violated her constitutionally protected liberty interests. *Id.* at 349. The plaintiff contended that the town and its officials had a special relationship with her, akin to custody, because her employment as Town Clerk required her to work in the town hall building in which the prisoners also regularly worked. *Id.* at 355. She further contended that each of the defendants, by permitting violent criminals to be assigned to the work squad and then failing to supervise them adequately, contributed to create a special danger to her. *Id.* at 351.

The district court in *Cornelius* found that no special relationship existed between the plaintiff and the defendants that could give rise to a constitutional duty to protect her from the work squad prisoners and granted summary judgment for the defendants. *Id.* at 349. The court of appeals reversed, holding that the plaintiff had presented evidence that established genuine issues of material fact as to whether the defendants had a special relationship with the plaintiff and were aware that the work squad prisoners posed a special danger to her. *Id.* The court, harmonizing its holding with *DeShaney,* emphasized "the degree of control the town officials exercised over [the plaintiff] as Town Clerk" and that the defendants "increased [her] vulnerability to harm by regularly exposing her to the work squad inmate by virtue of her position." *Id.* at 355–56. The court,

emphasizing the degree of control that the defendants exercised over the prisoners who harmed the plaintiff, also distinguished *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), in which the Supreme Court held that a parole board was not subject to liability under section 1983 for a murder committed by a parolee five months after his release from prison.

In *Wood,* the defendant, a state trooper, arrested a driver for intoxication, impounded the driver's car, and left the plaintiff passenger stranded alone in a high-crime area in the early hours of the morning. 879 F.2d at 586. As she attempted to make her way home, the plaintiff accepted a ride from a male stranger and was raped. *Id.* Plaintiff, in a section 1983 action against the trooper, alleged that his impoundment of the car in which she was travelling distinguished her from the general public and triggered an established constitutional duty to protect her liberty interests by seeing to her safety. *Id.* at 590. The district court granted summary judgment for the defendant on the ground that he owed the plaintiff no constitutional duty of protection and was entitled to good faith qualified immunity. *Id.* at 586. The court of appeals reversed, holding that the plaintiff had raised triable issues of fact as to whether the defendant affirmatively and with deliberate indifference had placed her in danger and then breached a due process duty of protection. *Id.* at 589–90.

We are, of course, not bound by *Cornelius* and *Wood.* At all events, we believe that the evidence introduced in *Cornelius* and in *Wood* contrasts in important respects with that offered in this case.

In *Cornelius,* the plaintiff introduced evidence that the defendants who employed her exercised a control over her work environment that arguably was sufficient to create a special, quasi-custodial relationship between them. The *Cornelius* plaintiff also supplied evidence that the defendants, prior to the prisoners' escape, had custody of them and were aware or should have been aware that the prisoners posed a special danger to her. In the case at bar, the

evidence that plaintiff has adduced with respect to Schwartz is gossamer. Plaintiff's evidence establishes only that Schwartz took Evans' statement and, consistent with Roselle police policy, passed on the information that he obtained to detective Grabowski for further investigation and action. Plaintiff, moreover, has provided no evidence that Grabowski, the officer assigned to Evans' case, in any way constrained either her general liberty or her freedom of her own accord to seek protection from McKenzie in the civil courts. Plaintiff also has failed to supply any evidence that either Schwartz or Grabowski had custody of McKenzie prior to his initial kidnapping and assault of Evans—a factor that might have triggered a constitutional duty on their parts to assist Evans subsequently in obtaining court protection from him. Indeed, McKenzie, like the individual who murdered the plaintiff's decedent in *Martinez*, was a parolee subject only to the limited control of a state parole board.

In *Wood*, the plaintiff introduced evidence that the defendant acted to place her in a perilous situation and then, with deliberate indifference to her danger, abandoned her. Once again, plaintiff in this case has adduced no evidence to show that Schwartz's contact with Evans was more than fleeting and merely prefatory to her contact with Grabowski. Plaintiff, moreover, has shown only that Grabowski failed to advise Evans of her rights under the Domestic Violence Act or otherwise. In contrast to the plaintiff in *Wood*, she has supplied no evidence that Grabowski, much less Schwartz, acted to create or to exacerbate the danger that McKenzie posed to Evans, thereby triggering a possible constitutional duty to assist her in gaining access to the civil courts.

In sum, Evans' constitutional right to receive assistance in gaining access to the civil courts could not have been established with the clarity required by *Mitchell, Harlow,* and *Anderson,* at the time that Grabowski and Schwartz allegedly violated it, because Evans possessed no such established right. The constitutional right of access to the civil courts plainly does not encompass a right to receive assistance in gaining access to the civil courts. Ultimately, then, under the facts at bar, plaintiff's section 1983 civil court access claim is not constitutionally cognizable. Moreover, under *DeShaney* and *Philadelphia Police and Fire Association,* the Domestic Violence Act cannot be construed as creating either a quasi-custodial relationship between defendants and Evans or any concomitant constitutional duty on their part to assist Evans in seeking protection from her assailant in the civil courts. Defendants' failure to inform Evans of her rights under New Jersey's Domestic Violence Act simply does not amount to a violation of Evans' constitutional right of access to the courts. We note that plaintiff has supplied no evidence to show that Schwartz had sufficient knowledge of Evans' prior cohabitation with McKenzie even to trigger his duties under the Domestic Violence Act. Grabowski could and should have instructed Evans as to her rights under the Act. He was not, however, constitutionally compelled to do so.

Finally, from a more factual perspective, plaintiff has adduced insufficient evidence to create a genuine issue of material fact as to her claim that Grabowski, much less Schwartz, acted so as to create a special relationship with Evans, triggering a constitutional duty to assist her in obtaining protection from McKenzie in the civil courts. Plaintiff has provided no evidence to show, as *DeShaney* would appear to require, that either defendant affirmatively barred the door to the civil courts to Evans, that he otherwise limited her freedom to act on her own behalf, or that he created or exacerbated the danger that McKenzie posed to her.

Given Grabowski's position of responsibility, the role of inert spectator to an unfolding tragedy that he chose to play is extremely disturbing. We believe, however, that the cases establishing and defining the constitutional right of access to the courts, the Supreme Court's holding in *DeShaney,* and our decision in *Philadelphia Police and Fire Association,* coupled with the evidence that plaintiff has adduced,

cannot be interpreted so as to uphold the district court's decision denying either defendant's motion for summary judgment on plaintiff's civil court access claim. We therefore will reverse the district court's denial of summary judgment to Grabowski and Schwartz on this claim.

### C. Count Three: The Equal Protection Claim

In count three, plaintiff claims that Grabowski and Schwartz, by failing to comply with New Jersey's Domestic Violence Act, breached their constitutional duty to enforce the state's laws equally and fairly, in violation of Evans' fourteenth amendment right to equal protection. She further alleges that defendants' failure to provide Evans with adequate protection resulted from a discriminatory animus toward victims of domestic violence, who primarily are women.

In developing her equal protection claim, plaintiff relies, as did the district court, on our decision in *Hynson v. City of Chester Legal Department*, 864 F.2d 1026 (3d Cir. 1988). In *Hynson*, we took note of the "growing trend of reliance on 42 U.S.C. § 1983 to bring an action against the police alleging that the policies used in handling domestic abuse cases violate the equal protection of women victims." *Id.* at 1027. We then announced a new precedent setting forth the requirements for stating an equal protection claim grounded in the unequal treatment of victims of domestic violence. We held that

> [i]n order to survive summary judgment, a plaintiff must proffer sufficient evidence that would allow a reasonable jury to infer that it is the policy or custom of the police to provide less protection to

victims of domestic violence than to other victims of violence, that discrimination against women was a motivating factor, and that the plaintiff was injured by the policy or custom.

*Id.* at 1031.

After setting forth the "prima facie" requirements for stating a constitutional claim of gender-based discrimination in police policies toward victims of domestic violence, we further determined, in *Hynson*, what a plaintiff must establish to overcome an official's assertion of qualified immunity. We held that, under *Harlow* and *Anderson*, the right to equal protection of a woman subjected to domestic violence must be both established and clear in its contours before an individual police officer loses qualified immunity from suit for its violation. *Id.* at 1032. We concluded that

> a police officer loses a qualified immunity to a claim that a facially neutral policy is executed in a discriminatory manner only if a reasonable police officer would know that the policy has a discriminatory impact on women, that bias against women was a motivating factor behind the adoption of the policy, and, that there is no important public interest served by the adoption of the policy.

*Id.*

 The district court denied defendants' motions for summary judgment, based on qualified immunity, on plaintiff's equal protection claim, opining that defendants' contention that they violated no clearly established equal protection right in their dealings with Evans "strains credulity." We might well agree, at least with respect to Grabowski, had the events that led to this action occurred at a later point in time.[12]

---

**12.** Plaintiff points to Grabowski's reluctance to file sexual assault and kidnapping charges against McKenzie once he learned that McKenzie and Evans had at one time lived together in an intimate fashion. Plaintiff further relies upon Grabowski's dismal record regarding domestic assaults. Grabowski himself admitted that he had not filed a single domestic violence complaint or report from the time the New Jersey Domestic Violence Act was enacted in 1982 until Evans' murder in 1985. Plaintiff supplied evidence that Grabowski, in addition,

made a practice of not informing victims, such as Evans, of their rights and options under the Act.

Plaintiff's evidence against Schwartz is much more slender. Plaintiff established that Schwartz, like Grabowski, failed to inform Evans of her rights and options under the Domestic Violence Act. She also showed that Schwartz had failed to file a domestic violence report in Evans' case. Schwartz asserted, however, that in Evans' case he served only as a conduit to Grabowski and that it was his regular

In *Hynson,* however, we announced that we had, "perhaps for the first time in a published opinion," articulated a standard for the district courts in this circuit to follow in section 1983 cases arising from domestic violence. *Hynson*'s self-conscious announcement of a new equal protection rule for this circuit occurred in December of 1988—nearly three years after the events giving rise to this action took place. Our research indicates that prior to January of 1985, when Evans sought the assistance and protection of the Roselle police, only one decided case, from another jurisdiction, dealt with equal protection rights in the context of an allegedly discriminatory implementation of a police policy concerning domestic violence.[13]

Our research also suggests that scholarship on the right to equal protection of victims of domestic abuse mainly postdates the period in which the events in this case took place. *See* Clark, *Crime Begins at Home: Let's Stop Punishing Victims and Perpetuating Violence,* 28 Wm. & Mary L.Rev. 263 (1987) (providing some discussion of equal protection rights in the context of law enforcement and domestic violence); Zimring, *Legal Perspectives on Family Violence,* 75 Calif.L.Rev. 521 (1987) (same); Case Comment, *Gender–Based Discrimination in Police Reluctance to Respond to Domestic Assault Complaints:* Thurman v. City of Torrington, 75 Geo.L.J. 667 (1986); Note, *Battered Women and the Equal Protection Clause:*

*Will the Constitution Help Them When the Police Won't?,* 95 Yale L.J. 788 (1986); *but see* L. Armstrong, *The Home Front: Notes From the Family War Zone* (1983) (urging that victims of domestic violence should be accorded basic security afforded by the law and the equal protection clause); Marcus, *Conjugal Violence: The Law of Force and the Force of Law,* 59 Calif.L. Rev. 1657 (1981) (non-enforcement of assault laws against victims of domestic violence violates the equal protection clause of the fourteenth amendment).

Our survey of these cases and materials strongly suggests that, in 1985, the equal protection rights of domestic violence victims were far less recognized and defined than they are today. We believe that *Thurman, see supra* note 13, a lone district court case from another jurisdiction, cannot sufficiently have established and limned the equal protection rights of a domestic violence victim, such as Evans, to enable reasonable officials to " 'anticipate [that] their conduct [might] give rise to liability for damages.' " *Anderson,* 483 U.S. at 646, 107 S.Ct. at 3042 (quoting *Davis,* 468 U.S. at 195, 104 S.Ct. at 3019). *Anderson*'s strict elaboration of *Harlow,* establishing that an official is entitled to summary judgment on grounds of qualified immunity, unless the right that the official is alleged to have violated is both clearly established and clear in its contours, may produce distressing results in cases such as this one.[14] We believe, however, that *Har-*

practice both to provide victims of domestic violence with information concerning their rights and to file domestic violence reports. Plaintiff supplied no evidence to refute this assertion.

**13.** In denying summary judgment to defendants, the district court relied upon this case, *Thurman,* 595 F.Supp. at 1521, which held that the plaintiff, who claimed that she was injured because the police applied an administrative classification so as to discriminate against women complaining of domestic abuse, stated a cognizable claim under section 1983 for the violation of her right to equal protection. *Id.* at 1526–29.

With the exception of *Thurman,* the cases cited in *Hynson,* by plaintiff, and by the district court as delineating the evolving right to equal protection of victims of domestic abuse, all were decided well after January of 1985. *See*

*Hynson,* 864 F.2d at 1027 n. 1 (citing *Watson v. Kansas City,* 857 F.2d 690 (10th Cir.1988); *Balistreri v. Pacifica Police Dept.,* 855 F.2d 1421 (9th Cir.1988); *Dudosh v. City of Allentown,* 665 F.Supp. 381 (E.D.Pa.1987), *reh'g denied sub nom Dudosh v. Warg,* 668 F.Supp. 944 (E.D.Pa.1987), *vacated in part,* 853 F.2d 917 (3d Cir.1988); *Sherrell ex. rel. Wooden v. City of Longview,* 683 F.Supp. 1108 (E.D.Tex.1987)).

**14.** *Anderson*'s rule has, for this reason, received criticism. *See* Rudovsky, *The Qualified Immunity Doctrine in the Supreme Court: Judicial Activism and the Restriction of Constitutional Rights,* 138 U.Pa.L.Rev. 23, 49 (1989) (criticizing *Anderson*'s holding for its "adoption of a standard that looks to whether … conduct had been previously clearly proscribed in a setting where the constitutional standard itself is defined by notions of reasonableness" and, there-

low, *Anderson,* and our recent decision in *Hynson* compel the holding that Grabowski and Schwartz are entitled to qualified immunity with respect to plaintiff's equal protection claim. We therefore will reverse the district court's decision denying summary judgment to defendants on this claim.

### D. *Count Four: Individual Liability of Police Chief Trolan*

In the fourth count of her complaint, plaintiff claims that the Roselle Police Department, the Borough of Roselle, and Chief Trolan, in both his individual and official capacities, violated Evans' right to equal protection, her right of access to the courts, and various other of her due process rights. Plaintiff claims, *inter alia,* that Trolan individually is liable for these violations of Evans' rights, because he failed to train and supervise his officers adequately. We concluded *supra* that although we lack jurisdiction over the appeals of the Department, the Borough, and Chief Trolan in his *official* capacity, we clearly have jurisdiction over Trolan's appeal, in his *individual* capacity, from the district court's denial of his claim that he is entitled to summary judgment on count four on grounds of qualified immunity.

 The district court denied summary judgment to all of the defendants named in count four. In arriving at this decision with respect to Trolan in his individual capacity, the district court relied exclusively on precedents governing *municipal* liability.[15] The court did not consider precedents, such as *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), or our decision in *Chinchello v. Fenton,* 805 F.2d 126 (3d Cir.1986), which, at the time that the events giving rise to this case

transpired, governed an official's liability, in his *individual* capacity, for violations of constitutional rights arising from the official's putative failure to train and supervise subordinates adequately. Indeed, the district court, in contending with the numerous issues that count four raises concerning municipal liability, did not specifically address whether Trolan, sued in his individual capacity, possesses qualified immunity from suit for the violations of Evans' constitutional rights allegedly arising from his failure to train and supervise his officers properly.

We believe that, at the time the events giving rise to this case occurred, the case law governing an individual's right to have a supervisory official take steps to ensure that subordinate police officers would not violate the individual's constitutional rights compels the conclusion that Trolan, in his individual capacity, possesses qualified immunity to plaintiff's claim in count four. *Rizzo,* as well as several of our precedents prevailing at the time, condition the liability of a supervisory official for constitutional violations perpetrated by subordinate police officers upon the official's direct and active involvement in the violations. The *Rizzo* Court overturned a district court order compelling individual city officials to afford sweeping equitable relief to the plaintiffs, because the defendant officials, in contrast to subordinate police officers, had not been found "by their *own* conduct" to have violated the plaintiffs' constitutional rights. 423 U.S. at 377, 96 S.Ct. at 607 (emphasis in original). We subsequently held that, under *Rizzo,* city officials could not be held liable or compelled to afford equitable relief for violations of constitutional rights committed by subordinate police officials,

---

fore, for unduly circumscribing constitutional rights).

**15.** The district court, for example, analyzed whether plaintiff, as required by *City of Los Angeles v. Heller,* 475 U.S. 796, 798–99, 106 S.Ct. 1571, 1572–73, 89 L.Ed.2d 806 (1986), had predicated the alleged derivative liability of the *municipal* defendants upon actual violations of constitutional rights by individual officers. The district court also emphasized the municipal plan or policy nexus necessary to trigger liability under section 1983, which the Supreme Court

established in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The district court looked, in addition, to *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), in which the Supreme Court held that a *municipality's* failure to train police officers may give rise to section 1983 liability when that failure demonstrates deliberate indifference to the constitutional rights of those with whom the police come in contact. *Id.*

unless they had "played an affirmative role in the deprivation of [those] rights." *Pennsylvania v. Porter*, 659 F.2d 306, 336 (3d Cir.1981), *cert. denied* 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982); *accord Black v. Stephens*, 662 F.2d 181, 189 (3d Cir.1981) (Under *Rizzo*, police chief may only be held liable for subordinate officer's unconstitutional activity if he participated in pattern of violation), *cert. denied* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); *Lewis v. Hyland*, 554 F.2d 93, 98 (3d Cir.) (injunctive relief against state police officials properly denied absent showing of participation or direct involvement in violations of constitutional rights perpetrated by subordinate officers), *cert. denied* 434 U.S. 931, 98 S.Ct. 419, 54 L.Ed.2d 291 (1977). These governing precedents stand for the proposition that, in the context of police action, an official's mere—and even callous—inaction in the face of subordinate officers' unconstitutional actions clearly does not suffice to render the official liable for those actions. *See Rizzo*, 423 U.S. at 376, 96 S.Ct. at 606; *Black*, 662 F.2d at 189; *Porter*, 659 F.2d at 336–37; *Lewis*, 554 F.2d at 98–99.

In *Chinchello*, a precedent that also governed at the time that the events giving rise to this case occurred, we applied *Rizzo* and our decisions concerning an official's constitutional liability for the failure to train and supervise subordinates in the context of an appeal, akin to Trolan's, from the denial of a claim of qualified immunity to a *Bivens* action alleging that the defendant official had violated the plaintiff's rights through his failures to train and supervise.

805 F.2d at 126. We concluded that *Rizzo* and our decisions stood for the proposition that "a supervising public official has [no] affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates." *Id.* at 133. We therefore held that the official's failure to train, supervise, and discipline subordinates could not, absent a showing of the official's direct involvement in the subordinates' unconstitutional actions, amount to the breach of a clearly established constitutional duty and that he was entitled to qualified immunity. *Id.* at 134.[16]

Plaintiff has presented considerable evidence that Chief Trolan presided over a detective bureau that was carelessly apathetic at best and grievously incompetent at worst. As we have detailed, the Union County prosecutor's office found that the Roselle Police Department's Detective Bureau completely lacked supervision, accomplished little work, filed few reports on the numerous cases assigned to it, and did nothing to follow up on crimes involving domestic violence. Plaintiff has supplied no evidence, however, that Chief Trolan directed or affirmatively participated in any of the actions claimed to have deprived Evans of her constitutional rights and, ultimately, her life. Under *Rizzo*, *Chinchello*, and the other decisions that we have discussed, Trolan's failure to train and supervise his subordinates, regardless of how inept and careless that failure may have been, cannot be held, consistent with *Mitchell*, *Harlow*, and *Anderson*, possibly

---

16. As the district court noted, *see supra* note 15, the Supreme Court, in *City of Canton v. Harris*, 109 S.Ct. at 1204, held that a municipality's failure to train police officers adequately may give rise to liability under section 1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." In *Stoneking v. Bradford Area School District*, 882 F.2d 720, 725 (3d Cir.1989), we held that, under *City of Canton*, a school official may be held liable in an individual, as well as an official, capacity when the official, with deliberate indifference to the consequences, establishes or maintains a policy, practice, or custom that directly causes a deprivation of the constitutional rights of a student. *See also Sample v. Diecks*, 885 F.2d 1099, 1117–

18 (3d Cir.1989) (holding, in context of section 1983 action against prison officials for unconstitutional detention, that "the standard of individual liability for supervisory public officials" could be no less stringent than the "deliberate indifference" standard for municipal liability established in *City of Canton* ). This case, however, is distinguishable from *Stoneking* in which we held that various school officials, sued in their individual, as well as official, capacities, were not entitled to summary judgment on plaintiff's claim that, from 1979 through 1985, they established or maintained a policy, practice, or custom of ignoring student complaints of sexual molestation by a teacher, with deliberate indifference to the consequences. *See* 882 F.2d at 722–25.

to have violated a constitutional right on Evans' part that was clearly established and clear in its contours. We therefore will reverse the district court's decision denying summary judgement to Trolan in his individual capacity on plaintiff's claim that, due to his failure to train and supervise his officers adequately, he violated Evans' constitutional rights.

## IV. CONCLUSION

In sum, we hold that defendants Grabowski and Schwartz are entitled to summary judgment on plaintiff's claims that they denied Evans her constitutionally protected right of access to the civil courts and her right to equal protection. We also hold that defendant Trolan is entitled to summary judgment, in his individual capacity, on plaintiff's claim that, through failing to train and supervise his officers adequately, he violated Evans' right to equal protection, her right of access to the courts, and other of her due process rights. We therefore will reverse the district court's denials of summary judgment to these defendants on these claims and remand the case to the district court with the direction to grant summary judgment thereon.

Due to the absence of finality, we conclude that we have no jurisdiction over plaintiff's appeal of the district court's deci-

sions dismissing her criminal court access claim and granting summary judgment to defendants Grabowski and Schwartz on plaintiff's claim that they violated Evans' right to due process by failing to afford her adequate protection. We conclude that, in the absence of finality, we also have no jurisdiction over the appeals by Chief Trolan, in his official capacity, the Roselle Police Department, and the Borough of Roselle from the district court's denial of summary judgment on plaintiff's claim that these defendants violated Evans' constitutional rights. In light of our holding that the New Jersey Tort Claims Act does not confer immunity from suit upon the defendants, we further conclude that we lack jurisdiction over the appeals by Grabowski, Schwartz, Trolan, the Roselle Police Department, and the Borough of Roselle from the district court's decision denying their motions for summary judgment on plaintiff's pendent state tort claims. These appeals therefore will be dismissed and the remaining claims in this case remanded for further proceedings.[17]

17. Because we have concluded that Grabowski, Schwartz, and Chief Trolan, sued in his individual capacity, are entitled to summary judgment, on remand these individuals will be pendent parties to the state tort claims comprising part of plaintiff's ongoing action. The district court therefore will have to determine whether it has pendent party jurisdiction over these defendants.

We note that Congress recently resolved this problem for the future by enacting legislation that prospectively provides the federal courts, in actions over which they have original jurisdiction, with supplemental jurisdiction over claims arising from the same case or controversy and that "involve the joinder or intervention of additional parties." S. 2648, 101st Cong., 2d Sess., 135 Cong.Rec. 17901, 17911–12 (daily ed. Oct. 27, 1990). Because this legislation is prospective in nature, however, the district court will have to look to prior case law to determine whether it has pendent party jurisdiction over Grabowski, Schwartz, and Trolan, in his individual capacity, with respect to plaintiff's state claims. *See Finley v. United States,* 490 U.S.

545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989) (rejecting pendent party jurisdiction under the Federal Tort Claims Act); *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976) (rejecting pendent party jurisdiction over county in section 1983 action); *see also Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 372 n. 12, 98 S.Ct. 2396, 2402 n. 12, 57 L.Ed.2d 274 (1978) (*Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), may have called into question the Court's decision in *Aldinger* as to pendent party jurisdiction over counties, but "in no way qualifies the holding of *Aldinger* that jurisdictional questions [concerning pendent party jurisdiction] are statutory as well as constitutional"). For our precedents concerning pendent party jurisdiction, see generally *Abromovage v. United Mine Workers of America,* 726 F.2d 972, 989–92 (3d Cir.1984) (established three-tiered analysis for whether exercise of pendent jurisdiction is appropriate); *Kuehner v. Schweiker,* 717 F.2d 813, 828 n. 17 (3d Cir.1983) (Becker, J., concurring) (opining that pendent party jurisdiction

provided basis for jurisdiction over pendent state defendants in action based upon Social Security Act and federal mandamus statute).