Karen HARTMAN, individually and as the administratrix of the estate of Douglas Paul Hartman, deceased, Plaintiff,

v.

David BACHERT, Ronald Miller, and the City of Allentown, Defendants.

Civ. A. No. 94–CV–0432.

United States District Court, E.D. Pennsylvania.

Jan. 31, 1995.

supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction.

29. This dismissal is without prejudice to plaintiffs' rights to present their claims in state court, although we note some doubt as to the validity of those claims. *See* footnote 11, *supra.*

Nicholas Noel, III, Easton, PA, for plaintiff.

James T. Huber, Allentown, PA, for defendants.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

Plaintiff commenced this action against the City of Allentown, and Officers David Bachert and Ronald Miller, both of the Allentown Police Department, alleging that they are liable under 42 U.S.C. § 1983 for violating the Constitutional rights under the Ninth and Fourteenth Amendments of Deputy Sheriff Douglas Paul Hartman of the Lehigh County Sheriff's Department. The complaint further alleges that defendants are liable under state wrongful death, survival action, and civil rights laws.[1] The gravamen of plaintiff's allegations is that defendants violated Hartman's federal and state rights by failing to protect him adequately during the course of his duties as a Lehigh County Deputy Sheriff. Deputy Hartman, while serving a warrant with the assistance of members of the Allentown Police Department, was killed by the third party upon whom he was serving the warrant. Defendants previously filed a Motion to Dismiss, which this court denied on April 13, 1994. Presently before the court is defendants' Motion for Summary Judgment, filed on November 22, 1994, to which plaintiff filed a reply on December 15, 1994. This court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment where the:

> pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

---

**1.** Plaintiff avers in her Reply that "discovery has not disclose [sic] facts sufficient to state a claim against defendant Ronald Miller and agree that he should be dismissed from this litigation." *See* Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 42. Accordingly, we dismiss Ronald Miller from this litigation with prejudice.

is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

"The party moving for summary judgment must demonstrate that, under the undisputed facts, the non-movant has failed to introduce evidence supporting a necessary element of his case." *In Re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1243 (3d Cir.1989). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321 n. 3, 106 S.Ct. 2548, 2552 n. 3, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)); *see also First Nat'l Bank v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

## II. FACTUAL BACKGROUND

Discovery is now closed and the relevant facts, as gleaned from plaintiff's Amended Complaint and Reply, are as follows. On the morning of July 7, 1992, Deputies Douglas Hartman and Ronald Atwell, of the Lehigh County Sheriff's Department arrived at 1943 East Dent Street in Allentown, a multi-unit apartment building, to serve an arrest warrant upon an individual known as Larry Parker. Deputy Hartman knocked on the door of Parker's second floor apartment several times, identifying himself as a Deputy Sheriff. Although he heard movement inside the apartment, no one responded.

Back outside a few minutes later, Hartman and Atwell saw a man they thought to be Parker attempting to exit the building through the roof, but he soon reentered his apartment. Plaintiff's Brief in Response to Motion for Summary Judgment at 1 (hereinafter "Plaintiff's Reply"); Deposition of Ronald Atwell at 79–80 (hereinafter "Atwell Deposition"). In response to this probable escape attempt, at approximately 9:40 a.m.,

Hartman and Atwell called the Allentown Police Department as well as the Lehigh County Sheriff's Department to request assistance in serving the warrant. At approximately 9:47 a.m., defendant Officers David Bachert and Ronald Miller of the Allentown Police Department arrived at the scene, while two Deputy Sheriffs from the Lehigh County Sheriff's Department arrived soon thereafter. Apparently, Officer Miller, upon arrival, ordered Officer Bachert to accompany Deputy Hartman in attempting to serve the warrant while Officer Miller accompanied Deputy Atwell to the rear of the building, in case Parker attempted to escape again. Amended Complaint at ¶ 12. Hartman and Bachert then approached the front door of Parker's apartment and knocked again several times. Again they received no response, although they heard movement inside.

Sometime between 9:47 and 9:52 a.m., the door to the apartment swung open unexpectedly and Parker appeared, pointing a handgun directly at Deputy Hartman. A young woman with a baby was also in the apartment. Deputy Hartman grabbed at Parker's wrists in an attempt to wrest the gun from his control. He and Parker struggled for the next minute, and several gunshots were fired, although none struck either Hartman or Parker. Officer Bachert was situated behind Hartman on the stairway and called in on his radio to report that shots had been fired and to request backup. Amended Complaint at ¶ 17. Plaintiff alleges that Officer Bachert remained at the entryway of the apartment during the struggle. Amended Complaint at ¶ 19.

Parker gained control of his gun and retreated into another room. As Deputy Hartman retreated toward the bathroom on his knees, Parker pointed his gun at him from across the room. Officer Bachert was in close proximity to Deputy Hartman at this point but did not enter the apartment. Amended Complaint at ¶ 20. Shortly thereafter, Officer Bachert exited the apartment building.[2] Deputy Atwell and another Deputy Sheriff who had arrived later both at-

---

2. Officer Bachert alleges that both Parker and Deputy Sheriff Hartman directed him to leave the building at the time Parker had his gun

pointed at Deputy Sheriff Hartman. Deposition of David Bachert at 67–71.

tempted individually to enter the apartment but were directed by Deputy Hartman to leave. Atwell Deposition at 98–100. By this time, more members of the Allentown Police Department, including members of the SWAT team, had arrived on the scene. They began to set up equipment and to query the men who had seen parts of the Parker apartment to get a sense of the layout. Atwell Deposition at 53–58. Between approximately 9:54 and 10:10 a.m., a gun battle ensued between Deputy Hartman and Parker, resulting in the deaths of both men. Amended Complaint at ¶¶ 23 and 24.

## III. DISCUSSION

Section 1983 provides for the imposition of liability on any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or the laws of the United States. It "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). Consequently, plaintiff brings her claim under the Ninth and Fourteenth Amendments to the Constitution.

To state a claim under § 1983, plaintiff must show both that (1) the offending conduct was committed by a person acting under color of state law, and (2) that such conduct deprived the plaintiffs of rights secured by the Constitution. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In this case, no party disputes that defendants were acting under color of state law. The issue we must turn to first, then, is whether the facts surrounding Deputy Hartman's death, as alleged in plaintiff's amended complaint, give

rise to a viable Fourteenth Amendment substantive due process claim under 42 U.S.C. § 1983.[3]

■ The Due Process Clause of the Fourteenth Amendment provides in relevant part "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This phrase has been understood to encompass both a procedural and a substantive element. *See Planned Parenthood v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992) ("Although a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty, for at least 105 years . . . the Clause has been understood to contain a substantive component as well. . . ."). The procedural element, which is not at issue here, guarantees that a state may not effect a deprivation of life, liberty, or property without certain procedural safeguards. The substantive element of the clause has a twofold interpretation. First, the clause selectively incorporates provisions of the Bill of Rights, and protects these rights from infringement by state and local governments. Second, the clause bars "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels,* 474 U.S. at 331, 106 S.Ct. at 665. The substantive element of the clause "prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'" *U.S. v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) (quoting *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)).

Recently, in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court examined the strictures of substantive due process.[4] Prior

3. We will analyze plaintiff's claim chiefly under the Fourteenth Amendment since the Ninth Amendment has never been held to encompass a substantive right to be "free from bodily harm" or to "adequate police protection." *Bernstein v. Lower Moreland Twp.,* 603 F.Supp. 907, 910 (E.D.Pa.1985) (holding that right of privacy did not support liberty interest which could form the basis of a civil rights action brought by survivors of a witness who was killed while under police

protection); *see also Gibson v. Matthews,* 926 F.2d 532 (6th Cir.1991) (finding that the Ninth Amendment does not confer substantive rights in addition to those conferred by other portions of our governing law).

4. In *DeShaney,* a mother, on behalf of her infant son, brought a § 1983 action against social workers alleging that they had deprived her son of his liberty interest in bodily integrity in violation of

to *DeShaney*, federal circuit courts were divided over the issue of when, if ever, the failure of state or local governmental authorities to provide an individual with adequate protective services constitutes a violation of the individual's due process rights. The Third and to an extent the Fourth Circuits had endorsed the proposition that if the State is aware of danger to an individual from a third party and undertakes to protect him from that danger, a "special relationship" may arise that imposes an affirmative constitutional duty to provide adequate protection. *See Estate of Bailey by Oare v. County of York*, 768 F.2d 503 (3d Cir.1985) (applying this proposition to the context of a child abuse case); *Jensen v. Conrad*, 747 F.2d 185 (4th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985). The First, Sixth, Seventh, Eleventh, and D.C. Circuits, however, had taken the position that the Due Process Clause of the Fourteenth Amendment does not require a state or local governmental entity to protect its citizens from private violence or "other mishaps not attributable to the conduct of its employees." *DeShaney v. Winnebago*, 812 F.2d 298, 301 (7th Cir.1987); *see also Estate of Gilmore v. Buckley*, 787 F.2d 714, 720–23 (1st Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986); *Bradberry v. Pinellas County*, 789 F.2d 1513 (11th Cir. 1986); *Janan v. Trammell*, 785 F.2d 557 (6th Cir.1986); *Washington v. District of Columbia*, 802 F.2d 1478, 1481–82 (D.C.Cir.1986).

In *DeShaney*, the Supreme Court affirmed the position of the latter group of circuits, holding that the Due Process Clause does not give rise to an affirmative duty on the part of a State to protect its citizens. The Court rejected the argument advanced by the petitioner that because the State was aware of the abuse of Joshua by his father and had made clear an intention to protect him, a special relationship was created that affirmatively obligated the State to protect the child:

[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.... Its purpose was to protect the people from the State, not to ensure that the State protected them from each other....

*Id.* 489 U.S. at 195–96, 109 S.Ct. at 1003. The Court acknowledged that in some instances a "special relationship" between the State and certain individuals could give rise to an affirmative duty on the part of State to protect that individual. However, they indicated that such an exception would arise only when the State had so restricted an individual's liberty that he was unable to care for himself, as is the case when one is in the State's "custody." *Id.* at 199, 109 S.Ct. at 1005. The only instance when a State would owe an affirmative duty to an individual in a noncustodial setting, the Court indicated, would be if the State had created or exacerbated the danger faced by the individual in some way. *Id.* at 201, 109 S.Ct. at 1006. However tragic the child's situation was, the *DeShaney* Court held, it did not fall within the scope of either one of these two narrow exceptions. Consequently, there had been no affirmative duty on the part of State to protect the child from the violence of a third party, in this case his father.

It is under these exceptions set forth in *DeShaney* that plaintiff presses her claims. First, she argues that a special relationship arose between Deputy Hartman and defendants, such that defendants owed Deputy

---

his substantive due process rights under the Fourteenth Amendment. The boy had been so severely and repeatedly beaten by his father that he had become mentally retarded. For more than a year, the defendants had received reports of abuse from various sources and had taken limited steps to address the situation but ultimately had not removed the child from the home. The mother alleged that defendants, because they should have been or actually were aware of the danger to the child, had a constitutional duty to intervene to protect him from his father.

Hartman an affirmative duty of protection. Plaintiff alleges that this relationship arose both by reason of defendants' knowledge of the dangerous situation and their assumption of control when arriving at the scene as well as their statutory obligations under 42 Pa.

C.S.A. § 8952.[5] Officer Bachert, she continues, transgressed this duty by failing to take action to assist Deputy Hartman in his struggle against Parker, and by "abandoning" the apartment in the midst of a life-threatening situation.[6] She also avers that her claims fit

5. The text of 42 Pa.C.S.A. § 8952 reads as follows:

§ 8952. **Primary Municipal Police Jurisdiction**

Any duly employed municipal police officer shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office anywhere within his primary jurisdiction as to:

(1) Any offense which the officer views or otherwise has probable cause to believe was committed within his jurisdiction.

(2) Any other event that occurs within his primary jurisdiction and which reasonably requires action on the part of the police in order to preserve, protect or defend persons or property or to otherwise maintain the peace and dignity of this Commonwealth.

6. The specific allegations against the defendants in the Amended Complaint are as follows:

\* \* \* \* \* \*

30. A special relationship was created by the City of Allentown through its Chief of Police, and/or its police officers to provide protection for the Plaintiff/Decedent, Douglas Paul Hartman, while executing an arrest warrant for one Larry Parker, in that the Defendants, jointly and/or severally:

a) Became aware of Hartman's life threatening situation;

b) Had knowledge of the potential for serious injury or death being inflicted upon Decedent Hartman;

c) Voluntarily assumed to render protective aid to Decedent Hartman from the harm that eventually occurred.

31. As a result of the special relationship, the City of Allentown and its officers undertook a duty to provide protective services to Douglas Paul Hartman, which he relied upon in the execution of said warrant.

\* \* \* \* \* \*

37. Because of the special relationship created between the City of Allentown, its Police Officers and Douglas Paul Hartman, Douglas Paul Hartman became clothed with certain rights and expectations of any and all necessary efforts to protect his well-being, life and personal safety.

38. As a Deputy Sheriff for the County of Lehigh, Douglas Paul Hartman, was a member of a special class of persons who at various times depend upon police protection necessary in the performance of their duties in serving Court papers.

\* \* \* \* \* \*

44. The Defendants herein, by and through the acts and omissions of Defendants Bachert

and Miller, breached their duty of care toward Deputy Hartman, jointly and/or severally by:

A. Failing to provide police personnel properly trained and equipped to provide timely and adequate protection for the Plaintiff/Decedent.

B. Abandoning Deputy Hartman and failing to remain at their post in order to provide said protection to the Decedent Hartman despite having direct knowledge of imminent and life threatening danger to the Decedent Hartman.

C. Failing to take all necessary and expected action in protecting and defending Hartman from obvious and life threatening harm, specifically including, but not limited to assisting Hartman in the struggle with Parker; apprehending or using necessary force against Parker once he and Hartman had separated; and the utilization of the Police Department's Emergency Response Team.

D. Failing to send the most experienced police officer into the building with Hartman as opposed to sending the least and inexperienced police officer, who ended up abandoning his post when the threat of violence occurred.

E. That the named Defendants, and especially Defendant Officer Bachert, acted with deliberate indifference and disregard for the health, safety, well-being and life of Douglas Paul Hartman by abandoning and withdrawing their protection after having already assumed such duty.

F. That the Defendants acted with deliberate indifference and disregard of the Plaintiff's/Decedent's health, safety, well-being and life by failing to take other acceptable and appropriate actions which were called for by accepted, established and known police practices and guidelines in which the Police Department failed to engage or undertake, or otherwise failed to train their officers to undertake.

G. Defendants Bachert and Miller's refusal to provide protection for the Decedent Hartman, of which they were fully aware was necessary, and which they initially assumed, thereby violated clearly established statutory and constitutional rights of the Decedent Hartman to be afforded such protection.

H. Said Defendants failed to act in a manner as a reasonable police officer, in that such an officer does not abandon a person situated like Decedent Hartman, knowing the facts and circumstances with which he was confronted.

I. Defendants exhibited callous disregard for the life and safety of the Decedent Hart-

within the second *DeShaney* exception, arguing that these same actions created or exacerbated the danger faced by Deputy Hartman. *See, supra* n. 6; Plaintiff's Reply at 20–26. Finally, plaintiff alleges that the City of Allentown breached its duty of care by directing Officer Bachert to provide "back-up" protection, despite the city's knowledge that he lacked experience in dealing with violent persons.[7]

### A. *Collins v. City of Harker Heights*

Although both parties in their respective memoranda engage in substantive discussions of the applicability of *DeShaney* and its progeny, we find that the case of most relevance to this situation is the Supreme Court's recent decision in *Collins v. City of Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). *Collins* applied the substantive due process analysis established in *DeShaney* to a factual situation very similar to the one at hand and consequently is instructive to our analysis of plaintiff's claims, to say the least. In *Collins,* the Court addressed the question of whether § 1983 provides a cause of action for a governmental employee alleging a violation of his substantive due process rights against the municipal government because it failed adequately to assure his safety or protection from harm during the course of his employment. *Id.* at 116–17, 112 S.Ct. at 1064. The petitioner's husband, a sanitation worker employed by the city, died of asphyxia after entering a manhole to unstop a sewer line. Petitioner's complaint alleged that the city was on notice of the dangerous conditions in the manholes because her husband's supervisor had been rendered unconscious several months earlier. *Id.* at 118 n. 1, 112 S.Ct. at 1064 n. 1. She brought a § 1983 action against the city, alleging that by "following a custom and policy of not training its employees about the dangers of working in sewers and not providing safety equipment and warnings," the city had violated her husband's substantive due process right "to be free from unreasonable risks of harm...."[8]

The Court understood the petitioner's claim as advancing two separate theories: First, "that the Federal Constitution imposes a duty on the city to provide its employees with minimal levels of safety and security in the workplace," or second, "that the city's 'deliberate indifference' to Collins' safety was arbitrary Government action that must 'shock the conscience' of federal judges." *Id.* at 126, 112 S.Ct. at 1069. The Court rejected the first theory on the grounds that the Due Process Clause does not require a state to

---

man by sending an inexperienced officer into the building with said Deputy, who then abandoned said Deputy for whom he was sent to protect.

J. Any and all other failures and breaches of duty that may be discovered in the course of said litigation.

\* \* \* \* \* \*

7. In addition to the allegations against the City of Allentown cited in the above footnote, plaintiff makes the following further allegations against the City in the Amended Complaint:

\* \* \* \* \* \*

33. The City of Allentown, through its police officials, supervisory officers, and/or Officer Miller knew or should have known that Officer David Bachert was not qualified for placement in the dangerous circumstances presented on July 7, 1992.

34. Said Officer Bachert had only been recently hired by the City of Allentown, and had received to that point in time only basic police training from the Allentown Police Academy and was quite inexperienced when it came to confronting violent or potentially violent individuals.

35. Despite knowledge of Officer Bachert's inexperience and lack of confrontational training; the City, through its officials, supervisory officers and/or Officer Miller directed and commanded said Officer Bachert to provide "back up" protection to Douglas Paul Hartman upon which the Decedent Hartman relied.

36. Acting against recognized and accepted police practices, specifically including but not limited to the areas of officer protection and hostage survival, Officer Bachert abandoned his post in providing back up assistance to Douglas Paul Hartman requiring the said Deputy Sheriff to defend himself when he had expected and relied upon back up protection from the City of Allentown Police Department personnel.

8. The district court dismissed the claim on the ground that a constitutional violation had not been alleged. *See Collins v. City of Harker Heights*, No. W–89–CA–168 (W.D.Tex. Oct. 30, 1988), and the Fifth Circuit affirmed on other grounds. *See Collins v. City of Harker Heights*, 916 F.2d 284 (5th Cir.1990).

provide minimum levels of safety and security. Justice Stevens, writing for a unanimous court, cited the Court's previous decision in *DeShaney*, and observed that,

> [n]either the text nor the history of the Due Process Clause supports petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause.... Petitioner's submission that the city violated a federal constitutional obligation to provide its employees with certain minimal levels of safety and security is unprecedented.

*Id.* at 127, 112 S.Ct. at 1069. The Court distinguished petitioner's claim from those in which the State did have a "continuing obligation to satisfy certain minimal custodial standards," by finding that petitioner could not maintain that the city deprived him of his liberty interest "when it made, and he voluntarily accepted, an offer of employment." *Id.* at 128, 112 S.Ct. at 1070.

The Court noted as significant the fact that petitioner had not alleged that decedent was "deliberately harmed" by the city nor that he was "instructed to go into the sewer when the supervisor knew or should have known that there was a significant risk that he would be injured." *Id.* at 125, 112 S.Ct. at 1069. Instead, petitioner claimed that the city's "deliberate indifference" to decedent's safety was action that must "shock the conscience." *Id.*

The Court was also unpersuaded by petitioner's second theory of liability, that the city's alleged failure to train its employees or warn them of known harm was an omission that could properly be characterized as "arbitrary, or conscience-shocking, in a constitutional sense." *Id.* They likened this argument to "a fairly typical state law tort claim: The city breached its duty of care to [petitioner's] husband by failing to provide a safe work environment," *id.*, and noted that in the past the Court has been unwilling to use substantive due process to "Constitutionalize" traditional areas of state law:

> Because the Due Process Clause does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society, we have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law. The reasoning in those cases applies with special force to claims asserted against public employers because state law, rather than the Federal Constitution, generally governs the substance of the employment relationship.

*Id.* (internal citations omitted).

The *Collins* decision confirmed the rationale of most circuits that, in dealing with cases factually similar to this one, had held that because the Due Process Clause does not assure safe working conditions for public employees, there could be no civil rights cause of action in those circumstances.[9] *See Washington v. District of Columbia*, 802 F.2d 1478 (D.C.Cir.1986); *de Jesus Benavides v. Santos*, 883 F.2d 385 (5th Cir.1989); *Walker v. Rowe*, 791 F.2d 507 (7th Cir.1986). Moreover, although *Collins* did not specifically address the situation in which an employee faces danger from a third party, as opposed to unsafe working conditions, several of these earlier circuit cases had addressed that issue.

In *Washington v. District of Columbia*, *supra*, a prison guard who was attacked and severely injured by a prisoner brought a § 1983 substantive due process action against the prison and the District of Columbia alleging a reckless failure to remedy unsafe conditions at the prison. The court held that while the prison guard may have stated a cause of action under state tort law, the

---

9. The Supreme Court accepted certiorari in *Collins* in part because of a contrary decision by the Eighth Circuit in *Ruge v. City of Bellevue*, 892 F.2d 738 (8th Cir.1989). *Collins*, 503 U.S. at 118–19, 112 S.Ct. at 1065. The *Ruge* court had held that a mother of a city employee who was killed when a ditch he was working in collapsed adequately alleged a municipal "policy" to state a civil rights claim. The plaintiff claimed that the city adhered to a longstanding policy of not shoring up walls of ditches into which it sent its employees, that the city knew of the dangers involved, and that it continued to require its employees to work in such ditches while intentionally failing to warn employees of their dangers. *Id.* at 740.

failure to provide prison guards a safe working environment did not violate any Constitutional or federal rights. 802 F.2d at 1480–81. The court rejected the appellant's attempt to analogize prison guards to others in state custody who did possess a Constitutional right to safety:

> Prison guards, unlike the prisoners in their charge, are not held in state custody. Their decision to work as guards is voluntary. If they deem the terms of their employment unsatisfactory, e.g., if salary, promotion prospects or safety are inadequate, they may seek employment elsewhere. The state did not force appellant to become a guard, and the state has no constitutional obligation to protect him from the hazards inherent in that occupation.

*Id.* at 1482.

The sentiments of this holding were echoed by the Fifth Circuit in *de Jesus Benavides v. Santos, supra.* In that case also, prison guards who were injured during the course of an attempted escape by prison inmates brought a § 1983 action against jail officials. The guards alleged that their due process rights were violated because of the officials' "callous indifference or grossly negligent failure to prevent, or to adequately guard against, or to protect those injured from, the attempted escape and accompanying inmate violence." 883 F.2d at 387. The court noted that while it seemed anomalous to afford greater protection to prisoners than to prison guards, "the affirmative duty to protect a prisoner (as well as a mental patient or other incarcerated person) arises only because of and 'when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself.'" *Id.* at 388 (quoting *DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1005). *See also Walker,* 791 F.2d at 507 (7th Cir.1986), *cert. denied,* 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986) (holding that prison guards who were killed or injured

during prison riot had no § 1983 cause of action against prison officials); *Rankin v. City of Wichita Falls,* 762 F.2d 444, 445 (5th Cir.1985) (holding that plaintiff whose husband, a sanitation worker, had drowned while trying to save another employee, and who alleged that the drowning was caused by work safety site defects had not stated a claim under § 1983); *Hogan v. City of Houston,* 819 F.2d 604 (5th Cir.1987), (holding that police officer who alleged that city policies allowed a prisoner to seize another officer's gun and shoot the plaintiff officer had not alleged a § 1983 cause of action).

The Third Circuit recently had occasion to consider the *Collins* decision in *Searles v. Southeastern Pennsylvania Transportation Authority,* 990 F.2d 789 (3d Cir.1993). In *Searles,* the wife of a passenger who was killed in an accident involving an elevated train brought a § 1983 substantive due process action against SEPTA and individual employees, claiming that the defendants' grossly negligent inspection and maintenance program resulted in her husband's death.[10] Applying *Collins,* the Third Circuit held that the appellant had not alleged a viable § 1983 cause of action, and thus affirmed the decision of the lower court dismissing the case. The court took special note of several similarities between the cases.

First, the court noted that the plaintiff in *Searles,* like the plaintiff in *Collins,* had not alleged that defendants had "deliberately harmed" her husband, but had instead asserted that "defendants adopted and followed a policy of deliberate indifference to the safety of a class of persons." *Id.* at 792. "Deliberate harm," the court pointed out was quite different from "deliberate indifference" in the context of a § 1983 claim. Second, the court observed, in both *Collins* and *Searles,* the respective plaintiffs had *voluntarily* entered into the actions that resulted in their deaths. Just as the plaintiff in *Collins* accepted the duties of his job voluntarily.

---

**10.** The car of an elevated train that decedent had been a passenger on derailed after a motor that had fallen from the bottom of a moving railcar struck a switch and caused the rear wheels of decedent's car to go onto a different track than the front wheels of the car. *Searles,* 990 F.2d at

790. The basis of plaintiff's allegations is that "defendants failed to secure the motor properly and also failed to discover the alleged dangerous condition despite numerous purported maintenance inspections. *Id.*

"[p]laintiff here was not deprived of liberty when he voluntarily chose to ride the El.... If the constitution does not impose a duty upon the government employer to provide its employees with a safe working environment ... it [does not] impose a duty on SEPTA to provide a safe passenger environment."

*Id.* (quoting district court opinion, 1992 WL 150701). Third, the court observed that the *Collins* Court had found the allegation that the city was on notice of the specific dangers posed by the manholes insufficient to "shock the conscience." The court noted that the complaint in *Searles* also alleged that the defendants knew or should have known of the risk to safety, but found that "if the conduct alleged in *Collins* was insufficient to shock the conscience, it follows that the conduct in these cases is also insufficient to support an action under Section 1983." *Id.* at 792–93. Finally, the *Searles* court resisted the plaintiffs' attempt to distinguish their situation as being one where, unlike *Collins,* the defendants created the danger. It found instead that in neither of these cases "was the injury directly caused by a state actor's affirmative act in the traditional sense." *Id.* at 793. In fact, the court noted, "one could argue that requiring an employee to work in an unsafe sewer was a more 'direct' cause of harm than offering a ride in an unsafe railcar." *Id.*

Applying the holdings of *Collins* and *Searles* to the situation at bar compels us to grant defendants' Motion for Summary Judgment. First, we cannot ignore the fact that, like the sanitation worker in *Collins* and the prison guard in *Washington,* Deputy Hartman entered into his duties as a Deputy Sheriff voluntarily and with knowledge of the possible dangers faced by law enforcement personnel. More than the sanitation worker in *Collins,* decedent's job involved routine exposure to danger, and he was aware of the substantial risk of harm faced daily. To paraphrase the D.C. Circuit's opinion in *Washington,* "[t]he state did not force appellant to become a [deputy sheriff], and the state has no constitutional obligation to protect him from the hazards inherent in that occupation." 802 F.2d at 1482; *see also Rankin,* 762 F.2d at 449 (decedent's "association with [defendant city's] treatment plant is not alleged to have been any less voluntary than his relationship with a private employer would have been.").

Second, like the plaintiffs in *Collins* and *Searles,* plaintiff here has not alleged that defendants deliberately harmed decedent nor that they sent decedent into danger aware of the risk of death he faced.[11] In fact, it was his own Sheriff's Department, not defendants, that directed Deputy Hartman to serve the warrant on Parker, just as he had routinely served countless others. Moreover, defendants learned of the danger posed by Parker only *after* decedent was in the situation that regrettably led to his death, not before. Finally, we cannot find, under the facts as alleged by plaintiff, that defendants conduct would "shock the conscience" of this court. *See Fagan,* 22 F.3d at 1303 ("the substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'") (discussing *Collins v. City of Harker Heights, supra*).

The situation before us is a tragic one indeed. Law enforcement personnel deserve our deepest admiration and gratitude for the protection they provide our communities daily. It is a grave day for all of us when an

---

11. In *Fagan v. City of Vineland,* 22 F.3d 1296 (3d Cir.1994), the Third Circuit in an *in banc* opinion reiterated the importance of the existence of "deliberate action" to a § 1983 cause of action: Significantly, in this case as in *Collins,* the plaintiffs have not alleged deliberate action, a factor the *Collins* Court emphasized when it noted that the plaintiff had "not charge[d] the city with a wilful violation of Collins' rights ... [or] claim[ed] that the city or any of its agents deliberately harmed her husband."  .... According to one commentator, this language "suggest[s] that 'deliberate' conduct [i]s required for a due process violation." 1 Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 3.13, at 35 (3d ed. Supp.1992). *Id.* at 1307, n. 7 (internal citations omitted). *See also Lewellen v. Metro. Govern. of Nashville,* 34 F.3d 345, 348 (6th Cir.1994) (finding that it is "firmly settled" after *Collins* that "injury caused by negligence does not constitute a 'deprivation' of any constitutionally protected interest.").

officer of the law is killed in the line of duty as Deputy Hartman was—more grave still when a family is left behind. Tragic as it may be, however, we have no choice but to rule as we do today. We are constrained by the dictates of *DeShaney, Collins,* and *Searles,* and under the holdings of those cases plaintiff's allegations do not meet the threshold requirements for a § 1983 cause of action.

### B. Special Relationship

■ Although our decision today rests squarely upon the Supreme Court's decision in *Collins,* we will nevertheless address briefly the issues raised by defendants and plaintiff in their respective Motion for Summary Judgment and Reply since neither party engaged in any substantial discussion of the applicability of *Collins.*

Defendants argue in their Motion for Summary Judgment that the facts, as recited by plaintiff in her Amended Complaint, fail to allege a violation of the decedent's civil rights. Specifically, they maintain that no special relationship was created between Deputy Hartman and defendants that gave rise to a duty to protect on their part nor did defendants create or exacerbate the danger faced by decedent. Consequently, they proffer, under *DeShaney v. Winnebago, supra,* there can be no § 1983 cause of action.

Addressing the special relationship argument first, we turn our attention back to the Supreme Court's opinion in *DeShaney.* In *DeShaney,* the Court explained that affirmative duties of care and protection arise under the Constitution only "with respect to particular individuals" and "in certain limited circumstances." *Id.* 489 U.S. at 198, 109 S.Ct. at 1004. These affirmative duties arise "not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200, 109 S.Ct. at 1005–06. Consequently, the *DeShaney* Court acknowledged the existence of these "special relationships" only when a person is in state custody, either through institutionalization or incarceration. In this situation, the Court explained, an individual's liberty is restrained

to such a degree that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs:

> In the substantive due process analysis, it is the [government's] affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* at 200, 109 S.Ct. at 1005–06.

While the plaintiff acknowledges the impact of the Court's ruling in *DeShaney* on her case, she nevertheless maintains that a special relationship was created between defendants and her husband. She alleges that this relationship arose by virtue of defendants' knowledge of the dangerous situation faced by decedent and their implied assumption of protective control when arriving at the scene as well as by virtue of the decedent being part of a special class of persons, deputy sheriffs, who at various times rely upon police protection in the performance of their duties. Amended Complaint ¶¶ 30 and 38. The argument continues that defendant Bachert had several opportunities to take action against Parker but failed to do so, thereby breaching the special relationship that had been created. We must necessarily find, in accordance with *DeShaney* and subsequent case law, that no special relationship existed between Deputy Hartman and defendants.

The general thrust of plaintiff's argument is that because the government is aware of danger and takes some sort of action to protect, it acquires a duty to do so properly and completely and its failure to do so is an abuse of governmental power that constitutes a substantive due process violation. This is the same argument that was heard and rejected by the *DeShaney* Court which found that an affirmative duty to protect arises "not from the State's knowledge of the individual's predicament or from its expressions of intent to help him," but because of the limitations it has imposed on his "freedom to act on his own behalf." *Id.* at 200, 109 S.Ct.

at 1005–06. As we discussed previously, the defendants in this case imposed no restriction on decedent's liberty since Deputy Sheriff Hartman voluntarily assumed the duties of his position.

Plaintiff attempts to circumvent this response, however, by arguing that in fact there was a "quasi-custodial relationship," created between decedent and defendants by virtue of decedent being under the "protective control of the Allentown Police Department." Complaint at ¶ 41. We find this argument to also be without merit. In *D.R. by L.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, 1370 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993). The Third Circuit stated unequivocally that the benchmark of a "special relationship" is "physical custody." *Id.* at 1370. In so finding, the court rejected the attempt by public high school students who were allegedly molested by other students on school premises during school hours to characterize themselves as being in the care and custody of school officials whom they were suing under § 1983.[12] The *in banc* court explained that,

> [t]he state's duty to prisoners and involuntarily committed patients exists because of the full time severe and continuous state restriction of liberty in both environments. Institutionalized persons are wholly dependent upon the state for food, shelter, clothing and safety. It is not within their power to provide for themselves, nor are they given the opportunity to seek outside help to meet their basic needs. Obviously, they are not free to leave.

*Id.* at 1371. By contrast, the court continued, it is parents who determine the circumstances of a child's education. Therefore, the school defendants' authority over the plaintiffs could not "create the type of physical custody necessary to bring it within the special relationship noted in *DeShaney." Id.* at 1371–72. *See Philadelphia Police & Fire Ass'n for Handicapped Children v. City of Philadelphia,* 874 F.2d 156 (3d Cir.1989)

(holding that "special relationship" exception did not apply to mentally handicapped children living at home since such an arrangement was akin only to "intermittent custody"); *Fialkowski v. Greenwich Home for Children, Inc.,* 921 F.2d 459 (3d Cir.1990) (deciding that no "special relationship" existed between the State and mentally retarded adult voluntarily placed at an institution because State had not substantially curtailed his freedom); *Black by Black v. Indiana Area Sch. Dist.,* 985 F.2d 707 (3d Cir.1993) (finding that children molested by school bus driver were not in a "special relationship" with school official because their presence on bus was voluntary); *Hunter v. Carbondale Area School District,* 829 F.Supp. 714 (M.D.Pa.1993), *aff'd* 5 F.3d 1489, *cert. denied* —— U.S. ——, 114 S.Ct. 903, 127 L.Ed.2d 94 (1994) (finding that school's authority over special education student during the day could not give rise to the type of physical custody necessary to constitute a "special relationship").

In a case factually similar to this one, the Seventh Circuit dealt with the issue of when, if ever, police protection must affirmatively be provided. In *Losinski v. County of Trempealeau,* 946 F.2d 544 (7th Cir.1991), a deputy sheriff accompanied a domestic violence victim to the trailer she had previously occupied with her estranged husband to retrieve her belongings. Evidence was presented that indicated that the victim would not have gone to the trailer without police protection. As they approached the trailer, the husband came outside and requested to speak to his wife alone which she agreed to do inside the trailer. After hearing loud voices emanating from inside, the deputy entered the living room area of the trailer but did not enter the bedroom where the husband and wife were arguing. Approximately one hour later, the husband shot his wife in the bedroom while the deputy remained in the living room. Her three children filed a § 1983 action against the County, the deputy, the Sheriff of the County, and the Sheriff's Department, alleging that a special relation-

---

12. D.R. specifically argued that since she was legally compelled to attend school and was placed under the control of state actors who were given parental authority over her as a matter of law, she was in effect in state custody during school hours. *D.R. by L.R.,* 972 F.2d at 1371.

ship was created between the County and decedent when the Sheriff's department agreed to provide her protection and that that relationship had been breached when the deputy sheriff did not provide their mother with protection from her husband.

The Seventh Circuit held that the factual circumstances of the case placed it outside the scope of the narrow "special relationship" exception since decedent was "neither coerced nor persuaded by the state to accept its protection." *Id.* at 550. Consequently, they affirmed the decision of the district court which had concluded,

> [decedent's] freedom to act on her own behalf was not restrained.... The agreement by the Sheriff's Department to assist plaintiff in retrieving her belongings did not create a Constitutional duty on the part of the defendants to protect her against the violence of her husband.

*Id.* at 548.

Plaintiff cites no precedent to support her position that her husband was in "protective custody." It would be anomolous, indeed, given the holdings of the above decisions, and in direct contradiction to Supreme Court and Third Circuit precedent for us to find that decedent, a grown man who was voluntarily performing his duties as a Lehigh County Deputy Sheriff, was in any type of "quasi-custodial" capacity, giving rise to a "special relationship." Custody implies restraint of liberty and that simply is not present here.[13]

We also reject plaintiff's related argument that Deputy Sheriff Hartman was "a member of a special class of persons who at various times depend upon police protection necessary in the performance of their duties in serving Court papers," Amended Complaint

at ¶ 38, and consequently an affirmative duty to protect was present. It may well be that an understanding exists that the Allentown Police Department will provide some sort of protective services to members of the Lehigh County Sheriff's Department while they are serving warrants, there is no Constitutional duty created from such an agreement. It is a "well-accepted principle" that "duties under state law cannot create constitutional obligations." *Fagan,* 22 F.3d at 1308. *See also DeShaney,* 489 U.S. at 201–02, 109 S.Ct. at 1006–07 (disavowing any duty created under the Due Process Clause by state statutory requirements); *Brown v. Grabowski,* 922 F.2d 1097, 1116 (3d Cir.1990), *cert. denied* 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991) (deciding that the New Jersey Domestic Violence Act could not be construed as creating "either a quasi-custodial relationship" or "any concomitant Constitutional duty"); *Losinski,* 946 F.2d at 551 (7th Cir.1991) (even if state law imposes a duty upon defendants, this does not give rise to § 1983 cause of action under the Due Process Clause, except when state law defines "property" which is also protected by the Clause); *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696 (9th Cir.1988) (Due Process Clause did not require police protection of plaintiff who was beaten by her estranged husband even though the state issued a restraining order); *Archie v. City of Racine,* 847 F.2d 1211 (7th Cir.1988); *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989) (deciding that even assuming a violation of state statutes, no § 1983 action can be ensued based solely on that basis); *Ellsworth v. City of Racine,* 774 F.2d 182 (7th Cir.1985), *cert. denied* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986) (holding

---

**13.** Furthermore, as the Tenth Circuit has pointed out, a contrary result might impose an unprecedented constitutional constraint on law enforcement officials. In *Bryson v. City of Edmond,* 905 F.2d 1386 (10th Cir.1990), police arrived after a gunman had taken postal employees hostage in a post office. Several of the hostages were either injured or killed and they, or their estates subsequently brought § 1983 and *Bivens* actions against the law enforcement personnel who had surrounded the building. They alleged that when police surrounded the building a special relationship was formed between them and the hostages that gave rise to a duty of affirmative

action on the part of the defendants. Because the police, for various reasons, had failed to prevent the plaintiffs from being either killed or injured, they alleged that the special relationship had been breached.

The Tenth Circuit squarely rejected this argument, pointing out that limitations on the employees' liberty were imposed by the gunman, not the police. *Id.* at 1393. "A contrary rule would impose constitutional duties on the police whenever they respond to reports of violence and assemble at the scene, not just in 'certain limited circumstances' and 'with respect to particular individuals' as taught by *DeShaney.*" *Id.*

that city did not have a Constitutional duty to protect the wife of a police officer to whom they had assigned a part-time bodyguard because of threats). As the Third Circuit pointed out in *Brown*, 922 F.2d at 1114, even though the dissent in *DeShaney* "urged that statutory or other action taken by a state to protect a class to which an individual belongs constitutes the most appropriate vantage point from which to begin analyzing whether a state unconstitutionally deprived an individual of due process rights," this simply was not the opinion of the majority in *DeShaney*, whose holding we are constrained to follow.[14] Consequently, for the above reasons, we find that no special relationship existed between decedent and defendants.

## C. State Created Danger Exception

■ As mentioned above, the Supreme Court left the door open for another exception to the *DeShaney* doctrine, the state created danger exception.[15] Since then, various courts have held that with regard to this theory, the relevant inquiry is "whether the state actors involved affirmatively acted to create plaintiff's danger, or to render him or her more vulnerable to it." *D.R. by L.R.*, 972 F.2d at 1373 (quoting *Bryson*, 905 F.2d at 1392); *see also L.W. v. Grubbs*, 974 F.2d 119 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990); *Cornelius v. Highland Lake*, 880 F.2d 348 (11th Cir.1989), *cert. denied, Spears v. Cornelius*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). Although some courts have blurred the distinction between this and the special relationship exception, the two must be evaluated separately since the state created danger exception does not require physical custody and thus allows a class of plaintiffs to press their claims who would be unable to do so under the "special relationship" exception. *See, L.W.*, 974 F.2d at 121.

Plaintiff maintains that defendant Bachert had a constitutional duty to act because he created or exacerbated the existing danger to decedent by "abandon[ing] his fellow law enforcement officer in time of need." Plaintiff's Reply at 18–19. She cites several cases to support her contentions.[16] A review of Third Circuit precedent and the cases cited by plaintiff, however, convinces us that this exception, like the special relationship one, is relatively narrow and has no applicability to the situation at hand.

In *Brown v. Grabowski*, 922 F.2d 1097 (3d Cir.1990), the Third Circuit considered the state created danger exception as discussed in *Wood* and *Cornelius*, two cases cited by plaintiff in which the courts found affirmative constitutional duties of protection. In *Brown*, the plaintiff decedent had reported to the police that her ex-boyfriend had held her hostage for three days and sexually assaulted her. The police did not place him under arrest nor did they inform decedent of her right to request a temporary restraining order under New Jersey's Domestic Violence Act. Decedent was later found dead in the trunk of her ex-boyfriend's car. The Third

---

**14.** For the same reasons we reject any attempt by plaintiff to buttress the existence of a special relationship with either a state statute, 42 Pa. C.S.A. § 8952, or police regulation, § 201.9 of the Allentown Police Department "Blue Book." Plaintiff's Reply at 11 and 30. By so deciding, we are not expressing any opinion as to the validity of plaintiff's claims under state law.

**15.** The Court noted that, "while the State may have been aware of the dangers that Joshua faced ... it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *DeShaney*, 489 U.S. at 201, 109 S.Ct. at 1006.

**16.** Plaintiff cites *Wood v. Ostrander, supra, Cornelius v. Town of Highland Lake, supra,* and *L.W. v. Grubbs, supra.* In *Wood*, a trooper arrested a driver and abandoned the female passenger in a high crime area in the middle of the night, thus creating the danger that she would be assaulted. In *Cornelius*, state prison officials instituted a prison work-release program which permitted prisoners to work in public areas with access to dangerous weapons under the supervision of an untrained city employee. Although only property offenders were supposed to be included in the program, the state allowed a prisoner with a violent criminal history to work in a town hall where he subsequently abducted an employee and held her hostage for three days. In *Grubbs*, the state placed a nurse in danger by assigning her to work alone with a dangerous inmate and failing to warn her that she would be exposed to sex offenders. In all three of these cases, the courts found that plaintiffs had alleged a cause of action under § 1983.

Circuit found that the state created danger exception did not apply, and distinguished the circumstances from *Wood:*

> In *Wood,* the plaintiff introduced evidence that the defendant acted to place her in a perilous situation and then, with deliberate indifference to her danger, abandoned her.... In contrast to the plaintiff in *Wood,* [plaintiff] has supplied no evidence that [a state actor] acted to create or to exacerbate.the danger that [the abductor] posed to [decedent], thereby triggering a possible constitutional duty to assist her in gaining access to the civil courts.

*Id.* at 1116. The court further noted that while the state actor's decision to play "inert spectator to an unfolding tragedy," was "extremely disturbing," there simply could not be a constitutional cause of action against him. *Id.*

In *D.R. by L.R.,* discussed above, the Third Circuit also declined to find defendants liable under the state created danger exception, holding that "school defendants did not create plaintiffs' peril, increase their risks of harm, or act to render them more vulnerable to the student defendants' assaults." *D.R. by L.R.,* 972 F.2d at 1374. It distinguished the situation at hand from *Wood* and *Cornelius* by noting that in those cases the state "affirmatively acted to create the danger to the victims," whereas in *D.R. by L.R.,* "plaintiffs' harm came about solely through the acts of private persons without the level of intermingling of state conduct with private violence that supported liability" in those cases. *Id.* at 1374–75.

In each of the cases cited as support by plaintiff, officials failed to take action to alleviate a danger which they created or aggravated.[17] In the present action, as in *D.R. by L.R.* and *Brown,* however, we can find nothing in the record before us that suggests that defendants encouraged, facilitated or authorized Parker's unwarranted and fatal assault on Deputy Sheriff Hartman. The service of warrants was a routine and daily practice for Deputy Hartman. Defendants did not send decedent to serve warrants, and it was a duty

he performed voluntarily as part of his employment. *See Salas v. Carpenter,* 980 F.2d 299 (5th Cir.1992) (deciding that sheriff did not violate due process rights of hostage being held by gunman, by creating danger that she would be killed, when he ordered police department personnel specially trained in handling hostage situations from scene and replaced them with county personnel); *Gregory v. City of Rogers,* 974 F.2d 1006 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993) (officer did not create danger that drunken persons would drive car by leaving them unsupervised while dealing with driver inside station); *Losinski,* 946 F.2d at 550 (state not liable under the state created danger exception when domestic abuse victim shot by her estranged husband while accompanied by a deputy sheriff since state did not subject her involuntarily to an existing danger; "Although the state walked with [decedent] as she approached the 'lion's den,' it did not force her to proceed.").

Furthermore, even assuming that defendant Bachert "abandoned" Hartman, there is no indication that decedent would necessarily be in a better position had Bachert not done so. *See Freeman v. Ferguson,* 911 F.2d 52, 55 (8th Cir.1990) ("A constitutional duty to protect an individual against private violence may exist in a non-custodial setting if the state has taken affirmative action which increases the individual's danger or, vulnerability to, such violence beyond the level it would have been at absent state action."). Consequently, even if Bachert had taken the actions desired by plaintiff, it is fully possible that this same tragedy would still have occurred. In *Bryson,* 905 F.2d at 1392, the Tenth Circuit found that city law enforcement officials who arrived at the scene of a post office with several workers inside within minutes of when a gunman started shooting "played no part in creating the danger to the victims, nor did they do anything to render them more vulnerable," because they classified the shooting as a hostage situation and did not attempt to enter the building for

---

17. We note that plaintiff's additional reliance on *Horton v. Flenory,* 889 F.2d 454 (3d Cir.1989), to support the state created danger exception is misplaced since the Third Circuit has read *Horton* "to turn upon a finding of 'functional' custody." *D.R. by L.R.,* 972 F.2d at 1375.

more than an hour and a half. In so holding, the court noted that,

> [i]t is obvious, however, that believing there was a hostage situation inside, had the police permitted others to rush into the midst of the audible gunfire, there might have been some basis for charging recklessness or indifference toward the public and possibly toward those inside.

*Id.* We agree with plaintiff that there is no question that Deputy Hartman was in danger. However, it was a danger created by a private actor, not the state. *See Jackson v. Byrne,* 738 F.2d 1443, 1446 (7th Cir.1984) (holding that city was not liable for deaths that occurred during fire fighters strike since fire fighters are under no constitutional duty to act and since fire, not government officials, killed plaintiffs' children).

### D. Qualified Immunity

Defendant Bachert has also moved for summary judgment based on the affirmative defense of qualified immunity. Although we have already granted summary judgment on other grounds, we find in the alternative that Bachert would be entitled qualified immunity.

■ State officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established Constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Thus "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action," depends both on the "clearly established" legal rules at the time the action was taken, as well as the "objective legal reasonableness" of those actions in light of the established law. *See Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct.·3034, 3038–39, 97 L.Ed.2d 523 (1987) (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). The Court in *Anderson* explained that:

> The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been declared unlawful, but it is to say the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 635, 107 S.Ct. at 3036–37. The immunity is not absolute but rather balances the interest in allowing public officials to perform their discretionary functions without fear of suit against the public's interest in vindicating important federal rights. *See Lee v. Mihalich,* 847 F.2d 66, 69 (3d Cir.1988).

■ "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is **the determination of whether the plaintiff has asserted a violation of a constitutional right at all.**'" *D.R. by L.R.,* 972 F.2d at 1368 (quoting *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991)) (emphasis in *D.R. by L.R.*). Since we have already held above that plaintiff has not asserted a violation of a Constitutional right, we must necessarily find that no "clearly established" rights of Deputy Hartman were violated by defendants.[18]

Moreover, under the facts as pled in plaintiff's amended complaint, we hold that no reasonable juror could find that Officer Bachert's actions were not objectively reasonable. The Supreme Court has advised that when evaluating the conduct of law enforcement officials, we must at all times remain cognizant of the difficulties of modern police work:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police

---

18. In any event, we note that plaintiff has not met her burden of demonstrating what "clearly established" rights may have been violated. *See Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984) (plaintiffs may overcome defendants qualified immunity only by showing that their rights were clearly established at the time of the conduct in issue); *Landstrom v. Illinois Dept. of Children and Family Servs.,* 892 F.2d 670, 675 (7th Cir.1991) (It is plaintiff's burden to demonstrate that a Constitutional right was clearly established).

officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving. . . .

*Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *Smith v. Freland,* 954 F.2d 343 (6th Cir.1992) ("What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure."). This admonishment is all the more compelling in a situation such as this where the relevant events all occurred in the space of approximately twenty minutes. Consequently we must be cognizant of the pressures upon Officer Bachert at the time of this incident. Confronting what he perceived as a possible hostage situation, we believe it was reasonable for Officer Bachert to believe that the best course of action would be for him to radio for help and then evacuate the premises. "We must never allow the theoretical sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *See Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity is applicable even where officials "of reasonable competence could disagree" that such acts were objectively reasonable, and "as the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").[19]

### E. Pendent State Law Claims

Since we have dismissed all of plaintiff's federal claims against defendants, the determination of whether to entertain or dismiss the pendent state claims is within our discretion.[20] The Supreme Court has indicated, however, that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United States Mineworkers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Accordingly, since we have dismissed all federal claims against all defendants in this action, we exercise our discretion to dismiss the pendent state claims.[21]

### IV. CONCLUSION

For the reasons outlined in the foregoing memorandum, we grant defendants' Motion for Summary Judgment.

An appropriate order follows.

### *ORDER*

AND NOW, this 31st day of January, 1995, upon consideration of Defendants' Motion for Summary Judgment, filed November 22, 1994, and Plaintiff's Reply thereto, filed on December 15, 1995, it is hereby **ORDERED** as follows:

1. Defendants' Motion for Summary Judgment is **GRANTED.**

2. Plaintiff's Pendent State Law Claims are **DISMISSED WITHOUT PREJUDICE.**

3. Judgment is Entered in Favor of All Defendants.

This Case is **CLOSED.**

**19.** Previously we found that, under the Supreme Court's decision in *Collins,* there was no § 1983 cause of action alleged against defendant City of Allentown. We now also hold, in the alternative, that since we have found there to be no basis for federal liability against defendant Bachert, there can necessarily be no basis for recovery against defendant City of Allentown. *See City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam) (holding that a municipal entity cannot be held liable for failing to train or supervise an officer where there is no underlying Constitutional violation by the officer).

**20.** 28 U.S.C. § 1367 codified the common law abstention doctrines and reads in relevant part: (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction.

**21.** This dismissal is of course without prejudice to plaintiffs' rights to present their claims in state court.